RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 05a0115p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ERRIC WALKER, STEVE RICKETTS, and VICKIE ATCHLEY,
on behalf of themselves and all others similarly situated,
*Plaintiffs-Appellees,*

*v.*

RYAN'S FAMILY STEAK HOUSES, INC.,
*Defendant-Appellant.*

No. 03-6468

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 02-01078—Aleta A. Trauger, District Judge.

Argued: February 2, 2005

Decided and Filed: March 9, 2005

Before: COLE and CLAY, Circuit Judges; HOOD, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Michael S. Pitts, NEXSEN, PRUET, JACOBS & POLLARD, Greenville, South Carolina, for Appellant. M. Reid Estes, Jr., STEWART, ESTES & DONNELL, Nashville, Tennessee, for Appellees. **ON BRIEF:** Michael S. Pitts, E. Grantland Burns, NEXSEN, PRUET, JACOBS & POLLARD, Greenville, South Carolina, William Alexander Blue, Jr., CONSTANGY, BROOKS & SMITH, Nashville, Tennessee, for Appellant. M. Reid Estes, Jr., Tanya B. Spavins, STEWART, ESTES & DONNELL, Nashville, Tennessee, for Appellees.

---

**OPINION**

---

CLAY, Circuit Judge. Defendant Ryan's Family Steak Houses, Inc. appeals the October 2, 2003 order of the district court, denying its motion to dismiss and petition to compel arbitration, pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3 and 4, of Plaintiff Erric Walker's, Steve Ricketts', and Vickie Atchley's claims for violations of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201-219. For the reasons that follow, we **AFFIRM**.

---

[*]The Honorable Denise Page Hood, United States District Judge for the Eastern District of Michigan, sitting by designation.

## I.

### A.    Procedural History

On November 12, 2002, Plaintiffs Erric Walker, Steve Ricketts, and Vickie Atchley filed a self-styled "collective action" complaint for violations of the FLSA against Defendant Ryan's Family Steak Houses, Inc. ("Ryan's") in the United States District Court for the Middle District of Tennessee. Ryan's is a Delaware corporation, with its principal place of business in South Carolina, and owns and operates a chain of over 300 restaurants in 22 states. Plaintiffs, former employees at various Ryan's locations in Tennessee, allege that Ryan's failed to pay them the minimum wage and/or one-and-one-half their regular rate of pay for all hours worked in excess of each 40 hour work week, in violation of the FLSA. After Plaintiffs filed suit, 18 additional unnamed plaintiffs filed their consent to become party plaintiffs in the lawsuit. Ryan's moved to dismiss Plaintiffs' complaint and petitioned for an order compelling Plaintiffs to arbitrate their claims pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3 and 4. Ryan's argued that Plaintiffs federal court claims were foreclosed by the arbitration agreements that each had executed at the outset of their employment.

On October 2, 2003, the district court denied Ryan's motion, holding that there was inadequate consideration for the arbitration agreements, the agreements had the hallmarks of unconscionable adhesion contracts, the agreements were not founded upon mutual assent, and Plaintiffs did not knowingly and voluntarily waive their constitutional right to a jury trial. The court also held that the arbitration forum provided for in the agreements is not able to provide for effective vindication of statutory claims and is an inappropriate substitute for the judicial forum. The court observed that the pool of arbitrators would be constituted in a biased manner and that the limited discovery available in the forum suggested structural bias in favor of the employer. The court further determined that the arbitration agreements appear to prohibit arbitration of class-based claims, which provides a powerful disincentive for employees to pursue individual claims of relatively low monetary value. Ryan's timely appealed.

### B.    Substantive Facts

Since 1996 or 1997, any individual who applies for employment with Ryan's has been presented with a 12-page application packet. The second page of the packet notifies the applicant that he or she is required to complete and sign the "Job Application Agreement to Arbitration of Employment-Related Disputes" (hereafter "Arbitration Agreement") in order to be considered for a position. Failure to sign and accept the Arbitration Agreement and its related rules and procedures purportedly terminates the job application process. After the one-page notice come five pages of single-spaced rules and procedures governing the arbitration procedure. Only after wading through the rules does the applicant get to the one-page job application for the positions of server, salad bar, dishwasher, frontline, hostess, meatcutter, cook, breadroom, or cashier. The two-page Arbitration Agreement, which the applicant must sign, then follows the application.[1]

Plaintiffs cite several examples of applicants who were hired on the spot after a 15 to 20 minute interview, during which the hiring manager hurriedly presented them with various documents that they were instructed to sign in order to be considered for a job. The manager rarely explained the nature of the Arbitration Agreement to the applicants, nor were the applicants given the opportunity to take home and review any of the forms before signing or provided with copies of the executed Arbitration Agreement or rules. Consequently, many of the applicants do not even recall executing the agreements.

---

[1]Named Plaintiff Vickie Atchley executed her agreement in 1994. At that time, the Arbitration Agreement was not included in the same package of documents as the employment application. Plaintiffs Walker and Ricketts executed their agreements in 2000 and 1998, respectively.

One Ryan's employee, Nanella Dukes, was hired on the spot, without filling out any paperwork. Only after working for four or five days was Dukes handed the application packet and told to sign the documents, with her manager explaining that the agreement meant that if Dukes "ever had any problems with Ryan's or Ryan's management, [she] had to 'go through Ryan's arbitration.'" Plaintiffs Julie Oaks and Steven Ricketts also were hired on the spot without first completing the Arbitration Agreement. Oaks's manager explained that the arbitration agreement meant that if Oaks ever had any problems with Ryan's, she "had to 'go through Ryan's ' before [she] could go to an attorney."

According to Dukes, based on her experience conducting new employee orientations, Ryan's managers would place an "x" in every spot an applicant was required to sign, and applicants would be instructed to sign every "x" without any explanation. Dukes's explanation of the application process is consistent with that of Paul Heuther, who worked as a manager at various Ryan's restaurants over a ten-year period. Heuther states that the application process typically would last no longer than 20 minutes, applicants often would be hired on the day that they applied when managers presented the application packet, they would simply tell the applicants that if they wanted a job, "sign these documents here." Heuther further explains, "Our supervisors at Ryan's told us during manager meetings with them, that if it came up to tell any job applicant that the arbitration agreement meant that problems would be handled 'up the chain of command,' and that we would handle problems 'in house' first, and if the problem could not be resolved there, then it would be taken to the supervisor to resolve."

Plaintiffs complain that the time-limited context in which they were presented with the Arbitration Agreement, combined with the managers' provision of misleading information about the agreement, is particularly problematic because many of the plaintiffs have not completed high school and/or were in dire financial circumstances at the time of application and therefore were desperate for the low-wage jobs Ryan's offers. Plaintiffs point out that the average annual salary for a top-paid Ryan's restaurant worker is approximately $16,000, while minimum wage employees make approximately $11,000 annually. Accordingly, Plaintiffs suggest that they had neither the ability nor the incentive to comprehend the significance of executing the Arbitration Agreement.

Unlike the typical pre-employment arbitration agreement which involves a contract between the applicant and his or her potential employer, Ryan's Arbitration Agreement is not between the applicant and Ryan's. Rather, it is between the applicant and Employment Dispute Services, Inc. ("EDSI"). EDSI is a South Carolina corporation whose sole business is the marketing and administration of the Employment Dispute Resolution Program. The program is a third-party arbitration system which was established in 1992 to provide employers and employees outside of the securities industry with a purportedly fair and expeditious means of resolving employment-related disputes. EDSI has contracts with a total of seven companies, including Ryan's.

The Arbitration Agreement that Plaintiffs executed explains that Ryan's (referred to therein as the "Company") had entered into a separate agreement with EDSI "to arbitrate and resolve any and all employment-related disputes between the Company's employees (and job applicants) and the Company." Although Plaintiffs were not provided with a copy of Ryan's separate agreement with EDSI, that agreement obligates EDSI to, *inter alia*, "administer and provide access to the EDSI alternative dispute resolution procedures and forum for all Company job applicants, employees, and the Company itself, as provided in the EDSI Rules and Procedures"; train managers and supervisors about the alternative dispute resolution program; and train managers and employees selected to serve as potential "adjudicators" in the program. Also, for an additional fee, EDSI will conduct "an employee relations audit (personnel polices and procedures, handbooks and other personnel forms), management training, and employee attitude surveys with recommended management responses." Ryan's agreement with EDSI is renewable from year to year, but Ryan's may cancel the contract with ten days' written notice.

By executing the Arbitration Agreement with EDSI, Plaintiffs agreed to (a) bring any employment disputes that he or she may have against Ryan's and that would otherwise be decided in a state or federal

court only in EDSI's arbitral forum[2] and (b) be bound by a final decision of the EDSI arbitration panel.  The purported consideration for Plaintiffs' promise to arbitrate is EDSI's agreement "to provide an arbitration forum, Rules and Procedures, and a hearing and decision based on any claim or dispute [that the applicant] may file or defend[.]"  According to the agreement, Ryan's is a third party beneficiary of the agreement between Plaintiffs and EDSI, and Plaintiffs are third party beneficiaries of Ryan's agreement with EDSI.  The agreement continues for the period of Plaintiffs' employment with Ryan's, unless mutually terminated in writing by Plaintiffs and EDSI.

The 2000 version of EDSI's Employment Dispute Resolution Rules and Procedures – the most recent version of the rules –  provides that the substantive rights and remedies in EDSI's arbitration forum are the same as are available in a federal or state court.  The rules govern all legal disputes, claims, or causes of action that arise out of the employment or possible employment of all parties signatory to an employment dispute resolution agreement with EDSI.  The rules govern both the claims of a "claimant" (i.e., an applicant or employee) and any claims that a signatory defendant might bring against a claimant who has signed the Arbitration Agreement.[3]

The rules further provide that a panel of three "adjudicators" resolves arbitration claims and are chosen from three separate selection pools:  (1) supervisors or managers of an employer signatory to an agreement with EDSI; (2) employees who are non-exempt from the wage and hour protections of the Fair Labor Standards Act; and (3) attorneys, retired judges, or other competent legal professional persons not associated with either party.  No individual who has been employed by an employer involved in the dispute can serve as an adjudicator.

EDSI provides the parties with a list of three potential adjudicators in each of the three selection pools.  The parties have access to a schedule of the adjudicators' fees and their employment history for at least the previous five years, along with related biographical information.  Potential adjudicators also are required to disclose any information which may preclude them from making an objective and impartial decision.

Once EDSI selects the pools of potential adjudicators, the claimant and the defendant alternately strike names from each of the three selection pools until one name from each pool remains.  Any potential adjudicator may be struck for cause.  As a matter of EDSI practice, if an adjudicator is removed from the pool for cause, EDSI provides another potential adjudicator.

Once arbitration proceedings commence,[4] any party may serve a request for production of documents, and counsel for the parties have subpoena power.  The rules also permit each party to schedule a deposition of one individual.  A party may file a request for additional depositions, "but such requests are not encouraged and shall be granted in extraordinary fact situations and for good cause shown."

Under the 2000 version of the rules, EDSI reserves the right to modify or amend the Rules after the date the claimant signs the Arbitration Agreement.  The claimant, however, has the right to have his or her dispute resolved pursuant to the rules that were in effect at the time the agreement was signed, unless he or she prefers the modified rules.

---

[2]Employment claims or charges handled by a state or federal agency are exempted from the agreement.

[3]The rules applicable from 1993 through 1998 state that they apply to resolve disputes involving individual or employer claims and/or claims of several parties, "including group or class actions."  EDSI excised the reference to "group or class actions" from the 1999 and 2000 versions of the rules.

[4]The arbitration takes place in the city or county in which the employee was employed, unless the employee requests a different location.

## II.

Plaintiffs filed a self-styled class action under the FLSA, seeking unpaid wages and related penalties against Ryan's. Ryan's argues that Plaintiffs' action should not be in federal court at all and, pursuant to the FAA, moved to enforce the pre-employment arbitration agreements that Plaintiffs executed. For the reasons that follow, we hold that the district correctly refused to enforce Plaintiffs' arbitration agreements as unenforceable under Tennessee law.

### A.     Standard of Review

This Court reviews *de novo* a district court's decisions regarding both the existence of a valid arbitration agreement and the arbitrability of a particular dispute. *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 311 (6th Cir. 2000) (citations omitted).

### B.     Analysis

#### 1.     The FAA and State Law

"The FAA provides for stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration, [9 U.S.C.] § 3, and for orders compelling arbitration when one party has failed, neglected, or refused to comply with an arbitration agreement, [*id.*] § 4." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991). "The FAA expresses a strong public policy favoring arbitration of a wide class of disputes." *Cooper v. MRM Investment Co.*, 367 F.3d 493, 498 (6th Cir. 2004). The Sixth Circuit has repeatedly applied the FAA to arbitration agreements formed in the employment setting. *E.g.*, *Cooper*, *supra*; *McMullen v. Meijer, Inc.*, 355 F.3d 485 (6th Cir. 2004 (*per curiam*); *Floss*, *supra*. In particular, statutory claims may be the subject of an arbitration agreement, including employment discrimination claims and claims under the FLSA. *Gilmer*, 500 U.S. at 26-35 (holding that there had been no showing that Congress intended to preclude the arbitration of claims under the Age Discrimination in Employment Act); *Floss*, 211 F.3d at 313 (holding that FLSA claims may be arbitrable).

The FAA provides that "[a] written provision in … a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "Thus, generally applicable state-law contract defenses like fraud, forgery, duress, mistake, lack of consideration or mutual obligation, or unconscionability, may invalidate arbitration agreements." *Cooper*, 367 F.3d at 498 (citations omitted). "The federal policy favoring arbitration, however, is taken into consideration even in applying ordinary state law." *Id.* (internal quotation marks and citations omitted).

#### 2.     Choice of Law

Tennessee law applies when analyzing the enforceability of the three named Plaintiffs' Arbitration Agreements because the agreements were executed in Tennessee and substantially performed in that state. *See Cooper*, 367 F.3d at 499 (holding that the district court correctly looked to Tennessee law to determine whether arbitration agreement was enforceable because the agreement was executed there, the plaintiff's employment and the alleged wrongful conduct occurred there, and neither party expected any other state's law to apply); *Floss*, 211 F.3d at 314 ("In deciding whether the agreements are enforceable, we examine applicable state-law contract principles.") (citations omitted). Ryan's argues, however, that the laws of other states apply to the plaintiffs who have opted-in to this litigation and who worked at Ryan's locations outside of Tennessee. Ryan's further argues that the district court violated its due process rights by applying only Tennessee law to address its motion to compel arbitration with respect to these opt-in plaintiffs. We disagree.

The Supreme Court has held that application of only one state's law in the context of a class action may violate the due process clause of the Fourteenth Amendment and the Full Faith and Credit Clause of Article IV, § 1 of the Constitution. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985) (holding that, for Kansas law to apply to class action by gas company investors seeking to recover interest on royalties, Kansas must have a significant contact or significant aggregation of contacts to the claims asserted by each member of the Plaintiff class, in order to ensure that the choice of Kansas law is not arbitrary or unfair). No constitutional problem exists in this case, however, if Tennessee law does not "conflict[] in any material way with any other law which could apply. There can be no injury in applying [Tennessee] law if it is not in conflict with that of any other jurisdiction connected to this suit." *Id.* at 816.

Ryan's has failed to demonstrate how Tennessee contract law materially conflicts with that of any other jurisdiction in which some of the opt-in plaintiffs worked. Ryan's has failed to show that the law of any other jurisdiction does not, like Tennessee, require consideration or mutuality for a valid contract or refuses to enforce unconscionable contracts. Instead, Ryan's cites to federal and state court decisions from other states which have enforced Ryan's Arbitration Agreement in other factual settings. These decisions, however, do not establish a material conflict in basic contract principles among the states. Indeed, judges within a state often reach different results in cases when applying identical state laws. *Compare Tenaglia v. Ryan's Family Steak Houses, Inc.*, No. 4:02-2684-25BH, slip op. at 13-21 (D.S.C. May 9, 2003) (copy in Addendum to Ryan's Brief) (applying South Carolina law; compelling arbitration after rejecting arguments that contract should be voided as an unconscionable contract of adhesion or due to lack of mutuality and consideration, duress, fraud in the inducement, or because the Plaintiff did not knowingly and voluntarily consent to arbitration) *with Brown v. Ryan's Family Steak Houses, Inc.*, No. 2:03-2582, slip op. at 10-11 (D.S.C. Feb. 27, 2004) (copy in Addendum to Plaintiffs' Brief) (applying South Carolina law; refusing to compel arbitration because the plaintiff lacked the capacity to consent to arbitration and because the plaintiff did not knowingly and voluntarily consent to arbitration). Because Ryan's has failed to demonstrate any relevant contradiction between Tennessee law and the law of another state, we reject Ryan's asserted constitutional prejudice stemming from the district court's reliance on Tennessee law to determine the enforceability of any of Plaintiffs' Arbitration Agreements.

### 3.          Consideration

In *Floss*, *supra*, this Court addressed the propriety of virtually the identical arbitral scheme at issue in this case and, as in this case, applied Tennessee contract law. At issue was the arbitrability of Plaintiffs Sharon Floss's and Kyle Daniels's FLSA claims in light of the arbitration agreement that they had executed with EDSI as part of their application for employment with Ryan's. As in this case, the plaintiffs argued that the EDSI rules and procedures did not allow them to effectively vindicate their FLSA claims on the grounds that the procedures allow for the appointment of a biased panel of arbitrators and unduly limited their discovery opportunities. *Floss*, 211 F.3d at 313-14.

After voicing its concerns over EDSI's arbitrator selection process, the *Floss* Court held that the plaintiffs were not bound by their arbitration agreements because, as a matter of Tennessee law, EDSI had not provided adequate consideration for the plaintiffs' promise to submit any dispute that they may have with Ryan's to arbitration with EDSI. *Floss*, 211 F.3d at 314-16. According to the EDSI rules then in effect, EDSI had reserved the right to alter the applicable rules and procedures without any obligation to notify or receive the consent of the plaintiffs. *Id.* at 315-16. The Court held that EDSI's right to choose the nature of its performance rendered its promise "fatally indefinite" and, therefore, lacking in consideration. *Id.* at 316.

In response to the holding in *Floss*, EDSI amended its rules and the Arbitration Agreement in 2000. As under prior versions, the 2000 rules give EDSI the right to modify or amend the rules after the date the claimant signs the Arbitration Agreement. The rules, however, include the following additional language: "[I]n the event these Rules and Procedures are modified after a Claimant has signed an Agreement, the claimant shall have the option to have his or her claim adjudicated under the Rules and Procedures that were

in effect on the date the Agreement was signed or the Rules and Procedures that are in effect on the date their claim is filed with EDSI."

EDSI amended the Arbitration Agreement to be consistent with the revised rules. The Arbitration Agreement used to provide that any employment-related dispute would be brought only in EDSI's arbitration forum and under its rules and Procedures, "as modified from time to time." The new agreement omits the "as modified from time to time" language and adds the following: "However, should the EDSI Rules and Procedures be amended, I shall have the right to choose to have my employment-related dispute resolved under the Rules and Procedures that are in effect on the date I sign this Agreement or the Rules and Procedures in effect on the date I file a claim with EDSI."

Ryan's maintains that these linguistic changes to the rules and the agreement cure the consideration problem that the *Floss* court identified; they argue that EDSI's promise is not illusory because Plaintiffs can insist on the rules in effect at the time they entered into their Arbitration Agreements. Plaintiffs disagree, arguing that EDSI still maintains the right to modify or amend the rules without notice or consent.

We hold that Plaintiffs have the better argument because they signed the identical Arbitration Agreement at issue in *Floss*. Their agreements explicitly reserve EDSI the right to modify or amend the rules from time to time, without providing Plaintiffs the right to insist on the rules in effect at the time that they executed their respective agreements. Although the 2000 version of the rules purport to afford Plaintiffs the right to enforce the rules in effect at the time of execution, Plaintiffs' agreements do not incorporate that right. Each of their agreements states that "My Agreement … contains the entire understanding and agreement of the parties regarding these subjects" and that "My Agreement may not be altered or amended, except in writing signed by the President of EDSI and Me."[5] There is no evidence in the record that any of Plaintiffs agreed in writing with the EDSI's President to adopt the 2000 version of the rules or that Plaintiffs provided any new consideration for EDSI's new promise to disregard (upon Plaintiffs' request) any post-execution amendments to its rules. Accordingly, as far as the named Plaintiffs are concerned, EDSI still retains the unfettered contractual right to alter or amend the rules and procedures, including the right to eliminate the rule added in 2000 that purports to give the claimant the right to enforce the rules and procedures that existed at the time that he or she executed the agreement. Therefore, Plaintiffs' Arbitration Agreements are no different from the agreements at issue, and held to be unenforceable, in *Floss* due to inadequate consideration from EDSI.[6]

Arguably, the consideration for Plaintiffs' promises to arbitrate derives from a source other than EDSI, such as a promise by Ryan's, which claims to be a third-party beneficiary of the contracts between EDSI and Plaintiffs. *See* RESTATEMENT (SECOND) OF CONTRACTS § 71(4) ("The performance or return promise [as consideration for a promise] may be given to the promisor or to some other person. It may be given by the promisee or by some other person."). We hold, however, that Ryan's has not provided adequate consideration.

Adequate consideration cannot take the form of Ryan's promise to submit any claims it may have against Plaintiffs to EDSI's arbitral forum. As explained by one district court:

> EDSI is bound by its promise to Plaintiffs only to the extent that Ryan's is bound to submit to the forum, for without Ryan's consent EDSI can provide no benefit to Plaintiffs. EDSI/Ryan's Contract contains an escape clause whereby Ryan's can cancel its Contract

---

[5] Plaintiff Atchley's agreement, executed in 1994, refers to "EDR" (Employment Dispute Resolution, Inc.), the former name of EDSI.

[6] *But see Gardner v. Ryan's*, No. 1:01CV00030, 2001 WL 1352113, at *3 (W.D. Va. Oct. 13, 2001) (holding that EDSI's modification of rules to give the claimant the right to choose which set of rules that he or she prefers cured the consideration problem evident in the prior version of the rules).

with EDSI on ten days notice. … This provision stands in clear contrast to the mutual termination clause found in the Arbitration Agreement, thus negating any consideration that Plaintiffs might be deemed to receive from EDSI's promise to provide the forum. Similarly, the ten-day escape clause eliminates consideration that might otherwise exist or flow from Plaintiffs' "third-party beneficiary" status, as alluded to in the Arbitration Agreement.

*Geiger v. Ryan's Family Steak Houses, Inc.*, 134 F. Supp. 2d 985, 1001 (S.D. Ind. 2001). Indeed, we question whether the agreement between EDSI and Ryan's even obligates Ryan's to submit to EDSI's arbitral forum at all. The EDSI/Ryan's agreement merely obligates EDSI (for a fee from Ryan's) to "*[a]dminister and provide access to* the EDSI alternative dispute resolution procedures and forum for all Company job applicants, employees, and the Company itself, as provided in the EDSI Rules and Procedures." (J.A. 1758.) (emphasis added). Notably, the agreement does not *require* Ryan's to submit its employment claims to the EDSI forum. Thus, the Arbitration Agreements that Plaintiffs executed misrepresent the meaning of the EDSI/Ryan's agreement by stating that Ryan's "has entered into an agreement with [EDSI] to arbitrate and resolve any and all employment-related disputes between the Company's employees (and job applicants) and the Company." In truth, it is only the Ryan's applicant or employee who has agreed to bring any employment-related dispute exclusively in the EDSI arbitration forum. *See, e.g.*, J.A. 108 (Arbitration Agreement, § B.1) ("Any employment-related dispute … will be brought ONLY in the EDSI arbitration forum ….") (emphasis in original). Although the EDSI/Ryan's contract refers to EDSI's rules, and those rules govern any employment claim Ryan's may have against an applicant or employee, *see* J.A. 310 (EDSI/Ryan's Contract, Article II, § 1(a), (b)), the rules do not require Ryan's to submit to the EDSI forum to resolve its employment disputes. Even if the rules did so provide, Ryan's promise to submit to that forum would be "fatally indefinite" because (a) Plaintiffs' Arbitration Agreements reserve EDSI's right to modify those rules and (b) Ryan's exerts significant financial control over EDSI[7] and, hence, the rules that supposedly bind Ryan's. *Floss*, 211 F.3d at 316.

Without any supporting Tennessee authority, Ryan's argues that the fact that it would not consider Plaintiffs' employment applications without their prior agreement to arbitrate constitutes sufficient consideration for Plaintiffs' promises to arbitrate. One district court has rejected this argument under Indiana law, holding that "merely a promise to consider an applicant's application, not employ her, … standing alone, will not bear the weight required to allow us to construe the Arbitration Agreement as a binding contract." *Geiger*, 134 F. Supp. 2d at 1001-02; *see also Penn v. Ryan's Family Steak Houses, Inc.*, 269 F.3d 753, 760-61 (7th Cir. 2001) (holding that there was no consideration for the plaintiff's arbitration agreement with EDSI; noting that "the defendants provide no evidence that any Indiana court has ever held that a mere promise to consider an application for employment would provide consideration for a separate contract"). We similarly conclude that Ryan's has failed to demonstrate that, under Tennessee law, an employer's promise to consider an employment application is adequate consideration for a promise to arbitrate employment disputes that are wholly unrelated to the application or hiring process. Moreover, the record in this case suggests that Ryan's has considered applications and hired applicants without first requiring them to execute an arbitration agreement. Nanella Dukes, Julie Oakes, and Steven Ricketts all were interviewed and hired without first completing their Arbitration Agreements, suggesting that Ryan's promise to consider only applicants who have agreed to arbitrate is illusory, and therefore inadequate, consideration for a promise to arbitrate any kind of employment-related dispute.

### 4.          Knowing and Voluntary Waiver of Right to File Suit in Federal Court

Citing this Court's holding in *KMC Co. v. Irving Trust Co.*, 757 F.2d 752 (6th Cir. 1985), the district court held that Plaintiffs could not be compelled to arbitrate their claims because they did not knowingly and voluntarily waive their constitutional right to a jury trial. *See KMC*, 757 F.2d at 755-56 (holding that the parties to a contract may by prior written agreement waive the right to jury trial as long as the waiver

---

[7]See Section III.B., *infra*.

is knowing and voluntary). A panel's recent decision in *Cooper* characterized *KMC*'s adoption of the knowing and voluntary standard as dictum, but nevertheless applied the standard. *See Cooper*, 367 F.3d at 507 (holding that "a party who enters an arbitration agreement necessarily consents to the clear and obvious consequence: the surrender of his right to go to trial"). We need not struggle with the question of whether *KMC* is binding precedent on this issue, because the *en banc* Court in *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 668 (6th Cir. 2003) (*en banc*) clearly adopted the knowing and voluntary standard for agreements to arbitrate in lieu of litigation.

According to *Morrison*, to evaluate whether a plaintiff has knowingly and voluntarily waived his or her right to pursue employment claims in federal court, the following factors must be evaluated: (1) plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances. *Id.* (quoting *Adams v. Philip Morris, Inc.*, 67 F.3d 580, 583 (6th Cir. 1995)). The district court correctly held that these factors demonstrate that Plaintiffs did not knowingly and voluntarily consent to arbitration.

First, most of the plaintiff class have not completed high school, and most were in dire financial circumstances at the time of application. The average annual salary for a top-paid Ryan's restaurant worker is approximately $16,000, while minimum wage employees make approximately $11,000 annually. Accordingly, the district court did not err in concluding that the experience, background, and level of education of the plaintiffs was "low to mid-level."

Second, Plaintiffs typically were hired on the spot after a brief interview, during which the hiring manager hurriedly presented them with various documents that they were instructed to sign in order to be considered for a job. According to one opt-in plaintiff, Ryan's managers would place an "x" in every spot an applicant is required to sign, and applicants would be told to sign every "x" without any explanation. The hiring manager usually would not mention the arbitration agreement, and Plaintiffs had no opportunity to take the Arbitration Agreement home or consult an attorney, even though the agreement purports to afford them that right. Unlike the arbitration agreement found to be knowingly and voluntarily executed in *Morrison* because the plaintiff had three days to withdraw her consent, *Morrison*, 317 F.3d at 668, Plaintiffs were given no option to revoke their consent to the Arbitration Agreement.

Additional evidence suggests that, on those occasions when Ryan's managers would discuss the agreement, they would provide misleading information. Plaintiff Julie Oaks's manager explained that the arbitration agreement meant that if Oaks ever had any problems with Ryan's, she "had to 'go through Ryan's ' before [she] could go to an attorney." Paul Heuther, a former manager at various Ryan's restaurants, explained that "supervisors at Ryan's told us during manager meetings with them, that if it came up to tell any job applicant that the arbitration agreement meant that problems would be handled 'up the chain of command,' and that we would handle problems 'in house' first, and if the problem could not be resolved there, then it would be taken to the supervisor to resolve." It is no surprise, therefore, that many of the plaintiffs do not even recall executing agreements that preclude them from vindicating their rights in state or federal court.

Third, the Arbitration Agreement's waiver provision states that the claimant agrees that any disputes with Ryan's "which would otherwise be decided in court, shall be resolved only through arbitration in the EDSI forum and NOT THROUGH LITIGATION IN STATE OR FEDERAL COURT." (J.A. 303) (emphasis in original). The district court found that the waiver provision is explicit, but not clear because it does not use more commonly understood waiver language about forgoing the right to have claims heard at "trial" or by a "jury." *Cf. Buraczynski v. Eyring*, 919 S.W.2d 314, 322 (Tenn. 1996) (affirming motion to compel arbitration of agreement that stated, "BY SIGNING THIS CONTRACT … YOU ARE GIVING UP YOUR RIGHT TO A JURY OR COURT TRIAL") (emphasis in original). We are not entirely persuaded by the district court's reasoning because the Arbitration Agreement does refer to the fact that the signatory agrees to arbitrate claims "which would otherwise be decided in court," conveying the key point

that the signatory will not be able to bring a claim in court. And, although the waiver provision does not refer to relinquishing the right to a jury trial, this Court has held that "a party who enters an arbitration agreement necessarily consents to the clear and obvious consequence: the surrender of his right to go to trial." *Cooper*, 367 F.3d at 508 (citation omitted). Nevertheless, the district court's conclusion is supported by the fact that most of the plaintiffs lack even a high school degree and, therefore, were at a disadvantage when attempting to comprehend the Arbitration Agreement's legalistic terminology. The court's conclusion is further supported by the fact that Ryan's managers appeared to have provided misleading information to several of the plaintiffs about what rights they would relinquish upon executing the Arbitration Agreement, providing them with a confused interpretation of the waiver language.

Fourth, for the reasons discussed above, the court correctly held that the agreements lacked consideration.

Like the district court, we hold that an analysis of the above-stated factors support the conclusion that Plaintiffs did not knowingly and voluntarily execute their Arbitration Agreements. Accordingly, the district court did not err in refusing to enforce them on this ground.

### 5.     Mutual Assent

The district court found that there was strong evidence that the Arbitration Agreements between Plaintiffs and EDSI did not result from a meeting of the minds in mutual assent. We agree.

It is well-settled under Tennessee law that a contract must result from a meeting of the minds of the parties in mutual assent to the terms. *Higgins v. Oil, Chemical and Atomic Workers Int'l Union, Local No. 3-677*, 811S.W.2d 875, 879 (Tenn. 1991). Although the question of mutual assent involves largely an objective analysis, the parties' intent remains relevant, in particular the circumstances surrounding the formation of the contract. *Id.* at 879. The district court below held that Plaintiffs did not mutually assent with EDSI to the terms of their Arbitration Agreements because there is a question as to whether Plaintiffs were provided with the rules when they signed the contracts, conflicting evidence about whether Plaintiffs knew what they were signing at the time they executed the agreements, and evidence that Ryan's managers provided misleading information about the agreements and the arbitration process prior to execution. The court concluded that these facts overcome the general presumption under Tennessee law that a party is under a duty to learn the contents of a written contract before signing and, therefore, may not deny that a contract he or she admittedly has signed and that expresses the agreement that he or she made. *See Giles v. Allstate Ins. Co.*, 871 S.W.2d 154, 156-57 (Tenn. Ct. App. 1993).

As legal support, the district court relied on *Howell v. NHC Healthcare-Fort Sanders, Inc.*, 109 S.W.3d 731, 735 (Tenn. Ct. App. 2003), where the Tennessee Court of Appeals held that the plaintiff was not bound by an arbitration agreement that a nursing home employee presented to him upon admitting his wife to a nursing home. According to the plaintiff, the employee "pushed" the documents in front of him and asked him to sign without explanation. *Id.* at 732. The plaintiff's daughter, who had accompanied the plaintiff, testified that she did not recall the nursing home employee even using the word "arbitration." *Id.* The nursing home employee testified that she paraphrased the arbitration agreement for the plaintiff. *Id.*

The court affirmed the denial of the motion to compel arbitration, holding that the defendant failed to meet its burden of showing that the parties actually bargained over the arbitration provision or that it was within the reasonable expectation of the ordinary person under the circumstances. *Id.* at 734-35. The court relied on the following facts to reach this conclusion: (1) the admission agreement was eleven pages long, but the arbitration provision was in the middle of page ten and did not adequately explain how the arbitration procedure would work; (2) the agreement was presented to the plaintiff on a "take-it-or-leave-it" basis while he was attempting to admit his wife to the nursing home; (3) the plaintiff had no real bargaining power; (4) the plaintiff's educational limitations were obvious; and (5) the agreement was not adequately

explained regarding the jury trial waiver. *Id.* at 734-35. Significantly, the court noted that the fact that the plaintiff could not read would not excuse him from a contract; however, because the nursing home employee took it upon herself to explain the contract, rather than asking the plaintiff to read it, she had an obligation to explain that he was waiving a right to a jury trial if a claim was brought against the nursing home, but she failed to do so. *Id.* at 735.

Although the facts of the *Howell* case arguably are more sympathetic than the facts in the instant case, we hold that Ryan's failed to meet its burden of showing Plaintiffs and EDSI actually bargained over the Arbitration Agreement or that it was within the reasonable expectation of the ordinary person considering the circumstances. As discussed in greater detail in the preceding discussion (whether Plaintiffs' waiver of their jury trial rights was knowing and voluntary), Plaintiffs were presented with the Arbitration Agreement in a hurried fashion and told to simply sign if they wanted to be considered for employment. The agreements were presented to Plaintiffs on a "take it or leave it" basis, and Plaintiffs had no real bargaining power; they had to sign the agreements if they wanted to be considered for employment. Although the Arbitration Agreements state that Plaintiffs had the right to consult an attorney, in reality, they had no opportunity to exercise that right because they had to sign the agreements on the spot. Plaintiffs educational limitations (many have not completed high school and were seeking jobs that would provide them poverty-level wages) also were obvious. Finally, on those occasions when Ryan's managers took it upon themselves to explain the Arbitration Agreement, they gave inaccurate information about the arbitration process and did not tell them that they were waiving their right to a jury trial. For these reasons, the district court correctly held that Plaintiffs did not mutually assent to arbitrate their employment disputes when they executed their agreements with EDSI.

### 6.          Unconscionable Adhesion Contracts

The district court held that Plaintiffs' Arbitration Agreements were unenforceable adhesion contracts. Under Tennessee law, an adhesion contract is "a standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or service except by acquiescing to the form of the contract." *Buraczynski*, 919 S.W.2d at 320 (quoting Black's Law Dictionary 40 (6th ed. 1990)). Here, Ryan's presented Plaintiffs with a standardized Arbitration Agreement at or around the time of applying for employment. Ryan's presented the agreements on a "take it or leave it" basis, because Plaintiffs had no opportunity to bargain over the agreements' terms and ostensibly would not be permitted to apply for employment without first agreeing to arbitrate.

We have some concerns about whether Plaintiffs demonstrated the final element of an adhesion contract: "the absence of a meaningful choice for the party occupying the weaker bargaining position." *Cooper*, *supra*, 367 F.3d at 501-02. To find their Arbitration Agreements adhesive, the district court was required to cite "evidence that [Plaintiffs] would be unable to find suitable employment if [they] refused to sign [EDSI's] agreement." *Id.* at 502. The court cited no such evidence. *Cf. id.* at 502-03 (reversing district court's finding that pre-employment arbitration agreement was an adhesion contract under Tennessee law because the record was silent on whether other local employers might have hired the Plaintiff without a similar agreement). Nevertheless, we note that the lack of such evidence may not be relevant to the agreements signed by Plaintiffs like Nanella Dukes, Julie Oakes, and Steven Ricketts, who were interviewed and hired without first executing their Arbitration Agreements. Arguably, because they already had been hired and were working when Ryan's presented them with the agreements, Ryan's may have terminated them had they refused to sign. Ryan's therefore had significantly more bargaining power over these Plaintiff-employees, who, unlike applicants, likely had forgone other employment opportunities and would have been severely disadvantaged by having to inform prospective employers that they were terminated shortly after their hire. In contrast to telling an applicant that he or she needs to sign the agreement or else do not bother applying, the threat of termination from one's current employment would appear to be sufficient in itself to demonstrate "the absence of a meaningful choice for the party occupying the weaker bargaining position." *Id.* at 501-02. We need not remand to the district court to reexamine this issue,

however, because the court correctly held that the Arbitration Agreements are unenforceable on other state law grounds. Accordingly, we affirm the court's denial of Ryan's motion to compel arbitration of Plaintiffs' claims.

## III.

In addition to refusing to enforce Plaintiffs' arbitration agreements on state law grounds, the district court held that the agreements are unenforceable because they do not allow Plaintiffs to effectively vindicate their rights under the FLSA. We agree for the reasons discussed below.

### A.          Standard of Review

This Court reviews *de novo* a district court's decisions regarding the arbitrability of a particular dispute. *Floss*, 211 F.3d at 311.

### B.          Analysis

Even if there is no contract-based defense to the enforceability of an arbitration agreement, a court cannot enforce the agreement as to a claim if the specific arbitral forum provided under the agreement does not "allow for the effective vindication of that claim." *Floss*, 211 F.3d at 313. Generally, a party cannot avoid the arbitration process simply by alleging that the arbitration panel will be biased, because the FAA "protects against bias, by providing that courts may overturn arbitration decisions '[w]here there was evident partiality or corruption in the arbitrators.'" *Gilmer*, 500 U.S. at 30 (quoting 9 U.S.C. § 10(b)); *see also id.* (declining "'to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious and impartial arbitrators'") (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 634 (1985)). However, the general rule prohibiting pre-arbitration challenges to an allegedly biased arbitration panel does not extend to an allegation that the arbitrator-selection process itself is fundamentally unfair. *McMullen*, 355 F.3d at 494 n.7. In such a case, "the arbitral forum is not an effective substitute for a judicial forum," and, therefore, the party need not arbitrate first and then allege bias through post-arbitration judicial review. *Id.*

The Arbitration Agreements and related rules and procedures at issue in this case demonstrate that EDSI's arbitral forum is not neutral and, therefore, the agreements are unenforceable. As previously described, under EDSI's rules, three "adjudicators" are selected from three separate selection pools to preside over the arbitration hearing. The first of these pools consists of supervisors and managers from another EDSI signatory company; the second consists of employees from another signatory; and the third contains attorneys, retired judges, and other "competent legal professional persons not associated with either party." Although dictum, language in *Floss* signaled this Court's extreme disapproval of this arbitrator selection mechanism:

> We have serious reservations as to whether the arbitral forum provided under the current version of the EDSI Rules and Procedures is suitable for the resolution of statutory claims. Specifically, the neutrality of the forum is far from clear in light of the uncertain relationship between Ryan's and EDSI. [Plaintiffs] Floss and Daniels suggest that EDSI is biased in favor of Ryan's and other employers because it has a financial interest in maintaining its arbitration service contracts with employers. Though the record does not clearly reflect whether EDSI, in contrast to the American Arbitration Association, operates on a for-profit basis, the potential for bias exists. In light of EDSI's role in determining the pool of potential arbitrators, any such bias would render the arbitral forum fundamentally unfair. *See Cole v. Burns Int'l Security Services*, 105 F.3d 1465, 1482 (D.C. Cir. 1997) ("At a minimum, statutory rights include both a substantive protection and access to a neutral forum in which to enforce those protections.").

*Id.* at 314; *see also McMullen*, *supra*, 355 F.3d at 493-94 (following dictum in *Floss* to strike down arbitration scheme in which employer had exclusive control over selection of arbitrator pool).

The record in this case removes any of the uncertainties surrounding the relationship between Ryan's and EDSI that the Court noted in *Floss*. EDSI is clearly a for-profit business, and Ryan's annual fee accounted for over 42% of EDSI's gross income in 2002. Given the symbiotic relationship between Ryan's and EDSI, Ryan's effectively determines the three pools of arbitrators, thereby rendering the arbitral forum fundamentally unfair to claimants who are applicants or employees. *See Geiger*, 134 F. Supp. 2d at 995 (holding that there is a strong potential for bias in the selection of the arbitration panel because EDSI receives payment from its agreements with various employers to provide a forum for resolving employment disputes, but no comparable payment is made by or received from an employee for agreeing to submit to the forum; further holding that EDSI's full authority to select both the Rules for arbitration as well as the pools of potential arbitrators, combined with EDSI's potential bias in favor of employers like Ryan's, rendered it "unlikely that applicants/employees will participate in an unbiased forum"); *McMullen*, 355 F.3d at 493-94 (holding that the employer's exclusive control over the pool of potential arbitrators prevented the plaintiff from effectively vindicating her Title VII rights: "[T]he arbitrator-selection procedure used by Meijer allows it to create the type of symbiotic relationship with its arbitrators that we feared would promulgate bias in *Floss*."); *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 938-39 (4th Cir. 1999) (affirming denial of motion to compel because the arbitration rules provided a mechanism for selecting a panel of three arbitrators that was crafted to ensure a biased decisionmaker; the employer created the list of potential arbitrators).

The bias against employees and applicants is significantly enhanced by the lack of any criteria governing employees of signatory companies who are eligible to serve as adjudicators. There are no minimum educational requirements, potential arbitrators do not need to have any relevant experience as an adjudicator, and there is no explicit requirement that they be unbiased. Similarly, the rules do not require that the legal professionals who comprise the third pool possess either substantive or procedural knowledge of dispute resolution or of the employment law issues involved in the arbitration. The names of potential arbitrators for the legal professional pool purportedly are provided to EDSI by an unaffiliated company, Resolute Systems, Inc.; however, there is no information in the record regarding how Resolute Systems selects potential adjudicators for EDSI's program.

The bias is exacerbated by the lack of a protocol governing EDSI's selection of potential adjudicators from the three pools. The individuals in the supervisor and employee pools are neither randomly selected nor chosen by a disinterested person for their skills. Instead, all members of these two pools are chosen by the small number of employers who, like Ryan's, have signed alternative dispute resolution agreements with EDSI: Golden Corral Steak Houses, K&W Cafeterias, Papa John's Pizza, Sticky Fingers Restaurants, The Cliffs at Glass, Inc., and Wieland Investments, Inc. In addition, the rules do not prevent a supervisor of a signatory company from sitting on an adjudication panel with a non-supervisory employee from the same company, including someone whom the supervisor directly supervises. Further, EDSI has no policy in place that prohibits a signatory company from discussing the arbitration process or specific claims with its employee adjudicators or from attempting to improperly influence its employee adjudicators.

Finally, the limited discovery that the EDSI forum provides could significantly prejudice employees or applicants. The rules allow "just one deposition as of right and additional depositions only at the discretion of the (arguably biased) panel, with the express policy that depositions 'are not encouraged and shall be granted in extraordinary fact situations only for good cause shown.'" *Geiger*, 134 F. Supp. 2d at 996 (quoting EDSI Rules, Art. XII, § 6; reproduced at J.A. 315.). We agree with the district court's conclusion in *Geiger* that "the limited discovery, controlled by a potentially biased arbitration panel, …

creates the unfairness to claimants." *Id.*[8] We acknowledge that the opportunity to undertake extensive discovery is not necessarily appropriate in an arbitral forum, the purpose of which is to reduce the costs of dispute resolution. Indeed, when parties enter arbitration agreements at arms-length they typically should expect that the extent of discovery will be more circumscribed than in a judicial setting. But parties to a valid arbitration agreement also expect that neutral arbitrators will preside over their disputes regarding both the resolution on the merits and the critical steps, including discovery, that precede the arbitration award. A structural bias in the make-up of the arbitration panel, which would stymie a party's attempt to marshal the evidence to prove or defend a claim, can be just as prejudicial as arbitral bias in the final decision on the merits. Such is the case here, providing an additional basis to conclude that EDSI's and Ryan's arbitration scheme does not allow for the effective vindication of Plaintiffs' FLSA claims.

## IV.

For all the foregoing reasons, we **AFFIRM** the district court's holdings that state law contract defenses preclude enforcement of Plaintiffs' arbitration agreements and that Plaintiffs' arbitration agreements are unenforceable under the FAA because they do not allow for effective vindication of their FLSA claims.

---

[8]Plaintiffs also complain that the current EDSI rules omit any reference to class actions, and the district court refused to compel arbitration because the rules appear to prohibit the arbitration of class actions. It does not appear, however, that arbitration procedures are required to provide for class actions. *See Gilmer*, 500 U.S. at 32 (rejecting argument that arbitration procedures were inconsistent with the purposes of the ADEA because they did not provide for class actions); *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 503 (4th Cir. 2002) (holding that there is "no suggestion in the text, legislative history, or purpose of the FLSA that Congress intended to confer a nonwaivable right to a class action under that statute").