# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### February 16, 2011 Session

## CUMBERLAND PROPERTIES, LLC v. RAVENWOOD CLUB, INC., ET AL.

### Direct Appeal from the Chancery Court for Davidson County
### No. 09-18-I     Claudia Bonnyman, Chancellor

---

### No. M2010-01814-COA-R3-CV - Filed April 5, 2011

---

This is a contract case.  Appellant, a Nashville Country Club, hired Appellee, a real estate development and consulting firm, to help the Club procure the best price available for the sale of its real property.  Appellee claimed that it was due fees under the parties' written agreement.  Following a hearing, the trial court entered judgment in favor of Appellee. Appellant appeals, arguing that: (1) the parties' contract was not supported by adequate consideration; (2) the parties' contract was void as against public policy based upon Appellants' allegation that Appellee was acting as a broker; (3) the trial court erred in allowing parol evidence and in its interpretation of the terms of the parties' agreement; and (4) the trial court erred in calculating Appellee's damages.  Discerning no error, we affirm and remand for determination of Appellee's reasonable attorney's fees and costs in defending this appeal.  Affirmed and remanded.

### Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Affirmed

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Samuel T. Bowman and William A. Lewis, Nashville, Tennessee, for the appellants, Ravenwood Club, Inc. and Ravenwood Country Club, LLC.

Kemper Harlan Dodson, III, Donald N. Capparella, Kristen B. Amonette, and Candi Renee Henry, Nashville, Tennessee, for the appellee, Cumberland Properties, LLC.

### OPINION

Ravenwood Country Club (the "Club") is located in the Hermitage area of Nashville. The Club is run by a volunteer board of directors that is comprised of members of the Club who are elected by the membership of the Club.  The Club has operated, under one owner

or another, for approximately fifty years. In recent years, it has operated under the ownership of Ravenwood Club, Inc., a non-profit corporation. Ravenwood Country Club, L.L.C., is a member-managed L.L.C. that owns all of the assets and liabilities of Ravenwood Club, Inc. (together with Ravenwood Country Club, L.L.C., "Ravenwood," or "Appellants").

Cumberland Properties, L.L.C. ("Cumberland," or "Appellee") is a real estate development, consulting, and brokerage firm. Glenn Dukes is acquisition manager for Cumberland, and he holds a Tennessee real estate broker license. Mr. Dukes has been in the real estate business for approximately thirty years. At all times relevant to this litigation, Mr. Dukes acted on behalf of Cumberland in negotiations with Ravenwood.

In 2002 and 2003, prior to the time that Ravenwood and Cumberland entered into the business agreement(s) that are the subject of the instant appeal, Ravenwood fell into a difficult financial condition. Ravenwood began to sell its property, including timber, in order to meet its financial obligations. One of Ravenwood's assets was a tract of real property that was comprised of approximately 91.62 acres of unzoned, undeveloped land to the north and northeast of the country club property.[1] Ravenwood's then-president, Lee Jennings, entered into negotiations with Freeman Webb Investments ("Freeman") to sell this undeveloped land. At that time, Ravenwood's property was essentially landlocked. There was no access for commercial developments, and it would not have been approved for residential access and development. Consequently, the development of the land would require access and re-zoning. Freeman owned property adjacent to the Club, which property could serve as access to Ravenwood's property with approval of the city. In addition, Freeman was attempting to secure another parcel of property–not owned by Ravenwood–by which it hoped to secure access to the Ravenwood property.

On July 15, 2003, Ravenwood and Freeman reached a tentative agreement, which was memorialized in a "Letter of Intent for the Purchase of [91.62] acres" sent from Freeman to Ravenwood's board of directors. Under the terms of this letter, Freeman proposed to pay $1,000,000 to Ravenwood for the 85 acres (which was later discovered to be 91.62 acres), and two hundred sixty-five memberships to the Club. The payment of the $1,000,000 was to be made according to the terms of the "payment of consideration" section of the letter, which required $470,000 of the total amount to be paid at the closing, with one-half of the membership dues ($265,000) also due at closing. As an incentive for retaining members, the letter further contemplated that, if the full membership dues were paid within four years of the closing, then the purchase price of $1,000,000 would be discounted to $10,000 per

_____

[1] The parties initially referenced the 91.62 acre tract as an 85 acre tract. Following a survey of the property, the actual acreage was found to be 91.62 and the initial error was corrected going forward in the record.

-2-

acre. Thus, the deal between Ravenwood and Freeman was essentially $850,000 for 85 acres of property and two hundred sixty-five Club memberships.

In an effort to better its position under the letter of intent with Freeman, Ravenwood hired Cumberland to consult. Ravenwood and Cumberland began a business relationship on October 21, 2003, when they entered into a letter agreement. The October 21, 2003 letter was superseded by a second letter dated November 18, 2003. The November 18, 2003 letter (the "Letter") sets out the scope of Cumberland's services as follows:

> The scope of services would include but not be limited to the following:
>
> 1. To represent Ravenwood Club's interest in the design and planning of any proposed development.
> 2. To inform the Board of Directors of the status of the project on an as needed basis.
> 3. To use its best efforts to negotiate more favorable terms for Ravenwood Club in the Definitive Agreement.
> 4. To use its best efforts to increase the amount of revenue to be received by Ravenwood Club from the sale of Property and Membership Interest ("Proceeds").

In consideration for these services, the Letter states that Cumberland's fee would be based on the following schedule:

> 1. Ten (10) percent of the amount of increase of Proceeds from One Million Dollars ($1,000,000) to One Million Two Hundred Thousand Dollars ($1,200,000).
> 2. Fifteen (15) percent of the amount of increase of Proceeds from One Million Two Hundred Thousand Dollars ($1,200,000) to One Million Four Hundred Thousand Dollars ($1,400,000).
> 3. Twenty (20) percent of any amount of increase of Proceeds in excess of One Million Four Hundred Thousand Dollars ($1,400,000).

In addition to the foregoing, the Letter further states that:

> [S]hould Cumberland Properties be successful in negotiating the deletion of Section 1(f) from the Letter of Intent between Ravenwood Club and Freeman...dated July 15, 2003 and the

purchase price for both the real property and the membership interest are paid in full at closing, Cumberland Properties shall receive three (3) percent of the Proceeds received by Ravenwood Club from the initial closing, said fee to be paid at closing.[2]

There shall be Twelve Thousand Five Hundred Dollars and No Cents ($12,500.00) of Earnest Money released from the Escrow Account to Ravenwood Club when the Purchase Contract is approved by the Board of Directors of [the Club]. The amount of such earnest money shall be divided equally between Ravenwood...and Cumberland....

This Letter is signed by Glenn Dukes on behalf of Cumberland, and by Richard Daugherty, as President of the Club.

Pursuant to the terms of the Letter, Cumberland, acting on behalf of Ravenwood, helped to negotiate the final terms of the sale of a portion of the 91.62 acres to Freeman. On December 10, 2003, Ravenwood and Freeman executed a Real Estate Purchase Contract (the "Freeman-Ravenwood Agreement"). Under the Freeman-Ravenwood Agreement, Freeman purchased approximately 61.12 acres of the total 91.62 acres and one-hundred ninety family memberships. The purchase price was set at $867,957.53. Under Paragraph 6.4 of the Freeman-Ravenwood Agreement, both Ravenwood and Freeman warranted "to the other [,] that no broker or agent has been engaged by it in connection with the negotiation and/or consummation of this Agreement."

On December 11, 2003 (the day after the Freeman-Ravenwood Agreement was executed), Ravenwood and Cumberland entered into a "Real Property Services Agreement" (the "Ravenwood-Cumberland Agreement"). The Ravenwood-Cumberland Agreement is signed by Mr. Dukes, on behalf of Cumberland, and by Mr. Daugherty, on behalf of Ravenwood. The Ravenwood-Cumberland Agreement, which was prepared by Cumberland's attorney, provides, in relevant part, as follows:

1. **Recital**. This Agreement supplements the letter agreement dated November 18, 2003 between Ravenwood Club and Cumberland Properties, L.L.C. regarding certain Property and Membership Interests (the "Letter Agreement").... The Letter

---

[2] Section 1(f) of the July 15, 2003 letter of intent provides for the decrease in purchase price to $10,000 per acre, as discussed above.

Agreement remains in full force and effect, as supplemented by this Agreement. This Agreement is not necessary in order to form the agreement between the parties, but does provide additional details for their convenience.

The Ravenwood-Cumberland Agreement states that "[t]he parties agree that Cumberland has already performed valuable services and will continue to perform such services in relation to" the sale between Ravenwood and Freeman. To that end, the services expected from Cumberland, under the Ravenwood-Cumberland Agreement, were substantially the same as those outlined in the Letter, *supra*. While the amount of fees due Cumberland for its services remained the same in the Ravenwood-Cumberland Agreement as it was in the Letter, *supra*, the parties added a clause in the Ravenwood-Cumberland Agreement that was not set out in the Letter, namely Paragraph 6(d), which provides:

> The parties contemplate that Ravenwood Club will sell the Property, and Membership Interests, expeditiously, and, in any event, on or before March 1, 2005, so that the Fee...would be paid within that period. However, should Ravenwood Club for any reason not sell all of the Property or Membership Interests on or before March 1, 2005 for any reason, including but not limited to the fact that Freeman Webb ([or] its successor) does not purchase all of the Property or Membership Interests, then, to the extent any such Property or Membership Interests are not then sold, Cumberland shall be paid the remaining portions of the Fee at such time or times as the remaining Property and Membership Interests are sold.

In addition to the foregoing provision, the Ravenwood-Cumberland Agreement also includes a "Buyout Provision," i.e., Paragraph 7(a), which provides:

> Should Ravenwood Club for any reason not sell all of the Property or Membership Interests on or before March 1, 2005 for any reason, including, but not limited to, the fact that Freeman Webb (or its successor) does not purchase all of the Property or Membership Interests, then Ravenwood Club shall have the right upon written notice to Cumberland, and Ravenwood Club shall have the obligation upon written request from Cumberland, to buyout the remaining Fee by paying to Cumberland the remaining Fee under the [fee] schedule [set out in the Ravenwood-Cumberland Agreement], based upon the fair

market value of the remaining Property and Membership Interests, as of the date of the giving of written notice.[3]

The Ravenwood-Cumberland Agreement also contains a merger/integration/no oral modification clause, i.e., Paragraph 10, which provides:

> This Agreement constitutes the entire agreement of the parties and any prior discussions, warranties, representations, understandings or agreements are merged herein and barred hereby. Each party warrants and represents that it is not relying on any information, projection, prediction or representation, written or verbal, from any source, except as expressly set forth in this Agreement. This Agreement may not be amended except by writing, signed by each of the parties, which writing sets forth as its express purpose the amendment of this Agreement. This Agreement may not be amended orally, by implication, waiver, course of dealing or industry custom.

On January 7, 2005, and as contemplated under the Freeman-Ravenwood Agreement (*supra*),[4] the sale of the 61.12 acres of the total 91.62 acres and one-hundred ninety family memberships closed. On the same day, Ravenwood and Cumberland executed an "Amended and Restated Real Property Services Agreement" (the "Amended Ravenwood-Cumberland Agreement"). Mr. Dukes testified that the purpose of the Amended Ravenwood-Cumberland Agreement was to add additional property to the service agreement; however, the record does not indicate any other property at issue other than the original 91.62 acres. Nonetheless, under the Amended Ravenwood-Cumberland Agreement, the services expected of Cumberland were expanded to include, in addition to the services outlined in the original Ravenwood-Cumberland Agreement, the following:

> (e) To obtain information as to potential users and uses of the Additional Property.
>
> (f) To communicate and meet with potential users or others

---

[3] Paragraph 7(b) of the Ravenwood-Cumberland Agreement states that, should the parties be unable to agree upon the fair market value of the Property and Membership Interests within thirty days after written notice, then the matter shall be submitted to binding arbitration.

[4] We note that Ravenwood and Freeman executed two addenda to the original Freeman-Ravenwood Agreement. These addenda, dated December 11, 2003 and January 4, 2005 respectively, do not bear on the instant appeal.

having information.

(g) To inform the Board of Directors as to the status of such matters as requested.

(h) To use its best efforts to advise as to terms and conditions for Ravenwood Club to consider.

In addition to the additional services, the Amended Ravenwood-Cumberland Agreement modifies the buyout provision (i.e., Paragraph 7) as follows:

(a) Should Ravenwood Club for any reason not sell all of the Property or Membership Interests on or before March 1, 2005 for any reason, including, but not limited to, the fact that Freeman Webb (or its successor) does not purchase all of the Property or Membership Interests, then Ravenwood Club shall have the obligation upon written request from Cumberland, to buyout the remaining Fee by paying to Cumberland the remaining Fee under the schedule in Paragraph 6 above, based upon the fair market value of the remaining Property and Membership Interests, as of the date of the giving of the written notice.[5]

The modification to the buyout provision will be discussed in more detail below. It is, however, important to note that the fee schedule remains the same in the Amended Ravenwood-Cumberland Agreement as it was in the original Ravenwood-Cumberland Agreement.

In August 2005, Cumberland negotiated, on behalf of Ravenwood, an option contract, whereby E. Phillips Development acquired an option to purchase the remaining 30.5 acres of Ravenwood property. The negotiated price was $2,000,000, and the sale was to close on or before July 15, 2009. The record indicates that, although E. Phillips Development exercised its option to purchase the 30.5 acres, for reasons unrelated to the instant lawsuit, the sale did not close.

---

[5] Although the Amended Ravenwood-Cumberland Agreement was attached to the original complaint, *see infra*, Mr. Dukes testified at trial that this was not, in fact, the agreement upon which Cumberland sought payment. Rather, because the Freeman sale closed before the Amended Ravenwood-Cumberland Agreement was executed, Cumberland sought payment related to that sale under the original Ravenwood-Cumberland Agreement, *supra*.

On May 2, 2008, Cumberland sent a written demand to be bought out under the terms of Paragraph 7(a) of the Ravenwood-Cumberland Agreement. In a follow-up letter, dated May 29, 2008, Cumberland suggested that the parties agree on a fair market value of $2,000,000 for the remaining property and membership interests. In the letter, Cumberland calculated the total due under the buyout provision, Paragraph 7(a), of the Ravenwood-Cumberland Agreement to be $343,591. On October 30, 2008, Cumberland filed a demand for arbitration, allegedly pursuant to the terms of the Ravenwood-Cumberland Agreement. However, Ravenwood took the position that it was not obligated to submit to arbitration. Ultimately, the parties could not agree on the fee amount due to Cumberland and, consequently, the present litigation ensued.

On January 7, 2009, Cumberland filed a petition for declaratory judgment against Ravenwood in the Chancery Court for Davidson County. By its petition, Cumberland asked the trial court to declare the amounts due to it under the Ravenwood-Cumberland Agreement. On February 12, 2009, Ravenwood filed its answer, wherein it avers that there is a genuine controversy as to the interpretation of the Ravenwood-Cumberland Agreement, and that same is "so vague, contradictory, and confusing as to be void and unenforceable." Ravenwood further states, in relevant part, that:

> 4. Cumberland apparently includes in its demand for payment the value of the 61.12 acres sold to Freeman Webb Investments, Inc. on January 7, 2005. At that time, Cumberland submitted a bill for consulting services in the sum of $26,038.73 which was paid in full at closing. Cumberland has waived the right to make any further claim for fees in connection with the sale to Freeman Webb....

In addition to denying the material allegations contained in Cumberland's petition for declaratory judgment, Ravenwood also claimed that Cumberland had breached the contract in relation to its dealings with E. Phillips Development, to wit:

> 7. Cumberland negotiated an agreement with E. Phillips Development, LLC, under which Ravenwood will receive a water line, sewer line and two fire hydrants at the value of $100,000.00 of which Ravenwood will pay one-half the cost, or $50,000. In exchange for this Ravenwood gave four sewer easements across the golf course.... These four sewer easements cover 4,000 feet crossing over the cart paths and irrigation system many times leaving the course scarred with manhole covers throughout the easement. The value of this easement is

-8-

$300,000, which gives Ravenwood a net loss of $250,000.00

8. Cumberland negotiated an agreement for 190 prepaid memberships as part of the purchase price of the Freeman Webb property that closed on January 7, 2009. There was no activation or expiration date on these memberships. There was no contractual method to receive revenue from these inactive members in the form of dues, increase of dues or assessment. There was an assessment from 1-1-07 thru 3-1-08 for a total of 15 months at $60.00 per month for all Ravenwood members. This resulted in a net loss of $171,000.00 to Ravenwood.

9. Cumberland negotiated an agreement with E. Phillips Development, LLC, under which Ravenwood may be required to exchange the scenic entrance it presently has for a new entrance so steep it borders on hazardous and will be treacherous in inclement weather. The old entrance gave Ravenwood a direct access to Stones River Road across land it owned in fee simple; the new road is only an easement across property that Ravenwood previously owned, which will inhibit further development of Ravenwood's remaining land. The net loss to Ravenwood in entrance value is $500,000.00.

10. Cumberland negotiated a Homeowner association fee for the new housing development of $30.00 per month for the use of the pool, tennis [courts] and grounds for a total of $360.00 per year. As of this date Ravenwood has received no revenue from this transaction. Ravenwood sells this membership for $450.00 for use from Memorial Day thru Labor Day. This results [in] a net loss of $90.00 x 190 homes = $17,100.00 per year x 10 years = $171,000.00 net loss to Ravenwood.

11. As a direct and proximate result of Cumberland's breach of the contract[] between the parties, Ravenwood has suffered damages and losses in the total sum of $1,092,000.00.

Cumberland answered the counterclaim on March 6, 2009, wherein it denied any breach of contract on its part.

On March 23, 2010, Ravenwood filed a motion for summary judgment on grounds

that: (1) Cumberland was not entitled to a commission for the sale of a 61.12 acre parcel of property because that property sold for less than the $1,000,000 threshold set by the Ravenwood-Cumberland Agreement; (2) the Ravenwood-Cumberland Agreement was unenforceable as a matter of law and policy because Cumberland is a licensed real estate broker and, therefore, is not entitled to collect a commission on the unsold parcel; (3) if, however, Cumberland was entitled to collect a commission on the unsold parcel, such commission was no more than $120,000.  Although we do not find an order denying the motion for summary judgment in the appellate record, it is obvious that the court did deny the motion as the matter proceeded to full hearing on May 25, 2010.  At the close of Cumberland's case-in-chief, Ravenwood moved for involuntary dismissal under Tennessee Rule of Civil Procedure 41.02.  This motion was denied.  Following the hearing, on July 30, 2010, the trial court entered a final order.[6]  Therein, the court specifically found that Ravenwood had failed to meet its burden regarding its counterclaim and, consequently, denied recovery thereon.  The court also made specific findings concerning the arbitration and consideration provisions of the Ravenwood-Cumberland Agreement, namely:

> 12.  The Court finds that the arbitration provisions are not relevant in this case for a number of reasons [which are not elaborated in the order] and by agreement of the parties.
>
> 13.  The Court also finds the preamble contained in the agreement that is the subject of this case relevant which states "[f]or and in consideration of the mutual agreements and understandings as herein contained, receipt and sufficiency of which consideration is hereby acknowledged, the parties agree to be bound as follows...."

The court awarded Cumberland judgment against Ravenwood in the amount of $343,591, plus attorney's fees,  expenses, and pre-judgment interest at a rate of six percent per annum.  In reaching these amounts, the court specifically found:

> 18.  The Court is aided by the testimony of Glenn Dukes about his math calculations, which also appear in Trial Exhibit 17, the language in the December 11, 2003 contract, Trial Exhibit 6, which refers to agreeing upon the fair market value of the property and membership interests upon which [Cumberland's] fee will be based, the definition of proceeds, and the definition of property.

---

[6]  An amended order was filed on July 30, 2010.

19. In applying paragraph six (6), sections a, b, and c of the agreement in this case, the Court finds that the fair market value of the thirty (30) acres of property, is two million dollars ($2,000,000) as agreed by the parties, and the fair market value of the rest of the property was its purchase price of eight hundred sixty-seven thousand nine hundred fifty-eight dollars ($867,958). Therefore, the total proceeds are two million eight hundred sixty-seven thousand nine hundred fifty-eight dollars ($2,867,958).

20. Based upon the fee structure set forth in the agreement and applying paragraph 7 and sections a, b, and c of paragraph 6, the Court finds that the amount of the proceeds totaling between one million dollars ($1,000,000) and one million two hundred thousand dollars ($1,200,000) is two hundred thousand dollars ($200,000). Ten percent (10%) of two hundred thousand dollars ($200,000) is twenty thousand dollars ($20,000).

21. The amount of proceeds totaling between one million two hundred thousand dollars ($1,200,000) and one million four hundred thousand dollars ($1,400,000) is two hundred thousand dollars ($200,000). Fifteen percent (15%) of two hundred thousand dollars ($200,000) is thirty thousand dollars ($30,000).

22. The Plaintiff's fee shall also be based upon twenty percent (20%) of the proceeds exceeding one million four hundred thousand dollars ($1,400,000). The court finds that the total proceeds in the amount of two million eight hundred sixty-seven thousand nine hundred fifty-eight dollars ($2,867,958) less one million four hundred thousand dollars ($1,400,000) is one million four hundred sixty-seven thousand nine hundred fifty-eight dollars ($1,467,958). Twenty percent (20%) of one million four hundred sixty-seven thousand nine hundred fifty-eight dollars ($1,465,958) is two hundred ninety-three thousand five hundred ninety one dollars ($293,591).

23. Thus, the total of twenty thousand dollars ($20,000), thirty thousand dollars ($30,000) and two hundred ninety-three thousand five hundred ninety-one dollars ($293,591) is three hundred forty-three thousand five hundred ninety-one dollars

($343,591), and the Court awards the Plaintiff a judgment against the Defendant in this amount.

In addition to the foregoing, the trial court also specifically found that the contract was neither unconscionable, nor without consideration:

> The Court further finds the contract is not unconscionable. There was no proof that the defendants lacked opportunity of choice. The parties noted there was mutual consideration to contract. The defendants did not show why the contract was unconscionable.

An order setting fees and expenses was entered on July 29, 2010. By this order, the trial court awarded Cumberland a judgment against Ravenwood in the amount of $140,470.55 for fees and expenses as the prevailing party.

Ravenwood appeals, and raises four issues for review as stated in its brief:

> 1. Whether the Chancery Court erred in finding the existence of sufficient and adequate consideration to support the Real Property Services Agreement when the evidence at trial demonstrated the lack of a new promise or forbearance on the party of Cumberland Properties in exchange for the benefit of the buyout provision in Paragraph 7(a) of the Real Property Services Agreement.

> 2. Whether the Chancery Court erred in concluding that Cumberland Properties was allowed to collect its commission under the terms of the Real Property Services Agreement when the 30.5-acre parcel of property never sold, and when Cumberland Properties did no more than procure an option to purchase the 30.5 acres.

> 3. Whether the Chancery Court erred in allowing Cumberland Properties to offer parol evidence that altered the plain meaning of the Real Property Services Agreement when the contract was unambiguous and contained an integration clause.

> 4. Alternatively, if this Court concludes that (a) a licensed real estate broker can collect a commission for property that has

-12-

never sold, and (b) the Real Property Services Agreement is supported by consideration, whether the Chancery Court erred in determining the amount of damages.

We first note that, because this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d).

It is well settled in Tennessee that the interpretation of a written contract is a matter of law, and thus, no presumption of correctness in its interpretation exists. ***NSA DBA Benefit Plan, v. Connecticut Gen. Life Ins. Co.***, 968 S.W.2d 791 (Tenn. Ct. App. 1997). The cardinal rule in the construction of contracts is to ascertain the intent of the parties. ***West v. Laminite Plastics Mfg. Co.***, 674 S.W.2d 310 (Tenn. Ct. App. 1984). If the contract is plain and unambiguous, the meaning thereof is a question of law, and it is the Court's function to interpret the contract as written according to its plain terms. ***Petty v. Sloan***, 277 S.W.2d 355 (Tenn. 1955). The language used in a contract must be taken and understood in its plain, ordinary, and popular sense. ***Bob Pearsall Motors, Inc. v. Regal-Chrysler Plymouth, Inc.***, 521 S.W.2d 578 (Tenn. 1975). In construing contracts, the words expressing the parties' intentions should be given the usual, natural, and ordinary meaning. ***Ballard v. N. Am. Life & Cas. Co.***, 667 S.W.2d 79 (Tenn. Ct. App. 1983). If the language of a written instrument is unambiguous, the Court must interpret it as written rather than according to the unexpressed intention of one of the parties. ***Sutton v. First Nat. Bank of Crossville***, 620 S.W.2d 526 (Tenn. Ct. App. 1981). In determining whether an ambiguity exists in a contract, we are guided by the following principles:

> Contractual language is ambiguous when it is susceptible to more than one interpretation and reasonably intelligent persons could come to different conclusions as to the meaning of the contract. However, an ambiguity arises in a contract only when contractual terms are susceptible to fair and honest differences, and when both of the interpretations advanced are reasonable.
>
> A word or expression in the contract may, standing alone, be capable of two meanings and yet the contract may be unambiguous. Thus, in determining whether or not there is such an ambiguity as calls for interpretation, the whole instrument must be considered, and not an isolated part, such as a single sentence or paragraph. The language in a contract must be

-13-

construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.

77 C.J.S. Contracts § 304 (citations omitted). However, a contract is not ambiguous merely because the parties have different interpretations of the contract's various provisions, *Cookeville Gynecology & Obstetrics, P.C. v. Southeastern Data Sys., Inc.*, 884 S.W.2d 458, 462 (citing *Oman Constr. Co. v. Tennessee Valley Authority*, 486 F. Supp. 375, 382 (M.D. Tenn. 1979)), nor can this Court create an ambiguity where none exists in the contract. *Cookeville P.C.*, 884 S.W.2d at 462 (citing *Edwards v. Travelers Indem. Co.*, 201 Tenn. 435, 300 S.W.2d 615, 617-18 (1957)).

## Consideration

"A party attempting to prove the existence of a contract 'is required to show that the agreement on which he [or she] relies was supported by adequate consideration [.]'" *Calabro v. Calabro*, 15 S.W.3d 873, 876 (Tenn. Ct. App. 1999) (quoting *Price v. Mercury Supply Company, Inc.*, 682 S.W.2d 924, 933 (Tenn. Ct. App. 1984)). The absence of consideration "renders the contract, undertaking, or promise void and unenforceable as between the parties." 21 Steven W. Feldman, Tennessee Practice: Contract Law and Practice § 5:1 (2007). Generally, it is not required that consideration be adequate in the sense that it represents actual value, *Lloyd v. Turner*, 602 S.W.2d 503, 509 (Tenn. Ct. App. 1980), and a contract will not be set aside for mere inadequacy. *Farrell v. Third Nat'l Bank*, 101 S.W.2d 158, 163 (Tenn. Ct. App. 1936). However, where the inadequacy of consideration is not the sole issue and the case involves other inequitable incidents, relief is more readily granted. *Woodard v. Bruce*, 339 S.W.2d 143, 148 (Tenn. Ct. App. 1960). Whether there is adequate consideration is a matter of law and may be reviewed by this court *de novo*. *Applewhite v. Allen*, 27 Tenn. 697 (1848).

Consideration may take a number of different forms, including a return promise. *See, e.g.*, *Estate of Hordeski v. First Federal Savings and Loan Ass'n of Russell County, Ala.*, 827 S.W.2d 302, 304 (Tenn. Ct. App. 1991) ("It may be a promise for a promise."). However, "[w]ords of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise." Restatement (Second) of Contracts § 77, cmt. a. This is referred to as an "illusory promise." A promise may be illusory because it "essentially promis[es] nothing at all, or allow[s] the promisor to decide whether or not to perform the promised act." *Walker v. Ryan's Family Steak Houses, Inc.*, 289 F. Supp. 2d 916, 929 (M.D. Tenn. 2003) (citations omitted), *aff'd*, 400 F.3d 370 (6th Cir. 2005), *cert. denied*, 546 U.S. 1030, 126 S. Ct. 730 (2005). Similarly, a "promise may also be illusory if it is too indefinite to be enforceable." *Id*. Courts do, however, generally endeavor to avoid

finding that a promise was illusory and that there was thereby a failure of consideration. *See, e.g.*, 1 E. Allan Farnsworth, Farnsworth on Contracts § 2.13, at 136 (3d ed. 2004). However, "[e]very contract imposes upon the parties a duty of good faith and fair dealing in the performance and interpretation of the contract." *Elliot v. Elliot*, 149 S.W.3d 77, 84-85 (Tenn. Ct. App. 2004) (citations omitted). Although this implied covenant cannot be used to create new contractual obligations or to alter the specific terms of a contract, *see, e.g., Goot v. Metro. Gov't of Nashville & Davidson County*, No. M2003-02013-COA-R3-CV, 2005 WL 3031638, at *7 (Tenn. Ct. App. Nov. 9, 2005) (citations omitted), courts often imply this covenant in order to prevent a promise from being deemed illusory. *See, e.g., Storek & Storek, Inc. v. Citicorp Real Estate, Inc*., 100 Cal. App. 4th 44, 61 (Cal. Ct. App. 2002).[7]

Tennessee Code Annotated Section 47-50-103 creates a rebuttable presumption that "[a]ll contracts in writing signed by the party to be bound, or the party's authorized agent and attorney, are prima facie evidence of a consideration." In the instant case, all of the documents at issue (and particularly the Letter and the Ravenwood-Cumberland Agreement) were signed. The question, then, is whether Ravenwood put forth any evidence to rebut the

---

[7]Perhaps the most famous instance of this is to be found in Justice Cardozo's opinion for the New York Court of Appeals in *Wood v. Lucy, Lady Duff-Gordon*, 118 N.E. 214 (N.Y. 1917). In *Wood* the plaintiff and defendant had entered into a contract whereby the plaintiff "was to have the exclusive right ... to place [the defendant's] indorsements on the designs of others ... [and] ... also to have the exclusive right to place [the defendant's] designs on sale, or to license others to market them." *Id*. at 214 The defendant breached this agreement and was sued. For her defense, the defendant contended that no contract existed because the plaintiff never made a return promise binding him to act. *Id.* The court rejected this argument and concluded that a "promise to pay the defendant one-half of the profits and revenues resulting from the exclusive agency and to render accounts monthly was a promise to use reasonable efforts to bring profits and revenues into existence." *Id*. at 215. "In the same vein, covenants to use 'good faith' or 'best efforts' to generate profits for the licensor are routinely implied where the licensor grants exclusive promotional or licensing rights in exchange for a percentage of profits or royalties, but the licensee does not expressly promise to do anything." *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 805 (Cal. Ct. App.1995). Similarly, because of this implied covenant of good faith, courts often uphold contracts that are made contingent upon the securing of financing on acceptable terms. *See, e.g., Mezzanotte v. Freeland*, 200 S.E.2d 410, 414-16 (N.C. Ct. App. 1973).

Another case is particularly instructive. In *Magruder Quarry & Co., L.L.C. v. Briscoe*, 83 S.W.3d 647 (Mo. Ct. App. 2002), the defendants were granted a lease to property "for the purpose of mining, quarrying, removing, and marketing limestone rock." *Id*. at 648. The lease provided that the rental rate would be "eighteen cents ($0.18) per ton of any and all rock product sold during the preceding month[.]" *Id*. In a suit against the lessees, the trial court held that the contract was null and void because this was no promise at all. *Id*. at 650. Reading into the parties' contract an implied covenant of good faith and reasonable efforts, the appellate court reversed and concluded that the contract was supported by adequate consideration. *Id*. at 652; *see Cordry v. Vanderbilt Mortg. & Fin., Inc*., 445 F.3d 1106, 1110-11 (8th Cir. 2006).

-15-

presumption of proper consideration. Before addressing this question, we first review the grounds for Ravenwood's argument.

Ravenwood's argument rests upon the addition of both the Recital paragraph and Paragraph 7(a) (the buyout provision) to the Ravenwood-Cumberland Agreement (both of which are set out in full above). Ravenwood cites Mr. Dukes' testimony that, from the onset of his engagement with Ravenwood, Cumberland was always engaged to perform the same services (i.e., the services under both the Letter and the Ravenwood-Cumberland Agreement were identical–that is to sell the 91.62 acres at the best price). However, Ravenwood contends that, because the buyout provision contained in the Ravenwood-Cumberland Agreement (*supra*) was not contained in the Letter, there was no consideration for the buyout clause. Ravenwood contends that the language contained in the Recital paragraph, indicating that the clause "is not necessary in order to form the agreement between the parties," is not necessarily true given the additional language that the Recital paragraph "provide[s] additional details for [the parties'] convenience." Ravenwood contends that these "additional details" were not, in fact, provided because the agreement (in terms of both services to be performed by Cumberland, and fees to be paid by Ravenwood) remained unchanged from the Letter to the Ravenwood-Cumberland Agreement. Consequently, Ravenwood contends that "[t]he only 'additional detail' seems to be the imposition of the substantial burden of the buyout provision," which provision "gave Cumberland...the right to be paid not based on the increase in the amount of Proceeds, but instead, based on the hypothetical increase in the fair market value of the property at the time the demand was made." Without proper consideration, Ravenwood contends that the buyout provision is unenforceable.

To support its contention that Cumberland provided no addition consideration for the buyout provision, Ravenwood relies upon the testimony of Mr. Dukes, which was adduced during his cross-examination. Mr. Dukes admitted that Cumberland had performed substantially the same services under both the Letter and Ravenwood-Cumberland Agreement. Ravenwood argues that Mr. Dukes' testimony "is clear that Cumberland...never did anything, nor promised to do or forebear from doing, anything different from the first day of its engagement until the last day of the engagement." While we concede that the obligations and fee structure agreed upon by Ravenwood and Cumberland remained substantially unchanged during the course of their dealings, this fact, standing alone, does not negate the trial court's finding that consideration was given.

The parties entered into the Letter on November 18, 2003. Cumberland's efforts, pursuant to the Letter, resulted in the December 10, 2003 Freeman-Ravenwood Agreement. Following the execution of the Freeman-Ravenwood Agreement, Ravenwood and Cumberland discussed the fact that Ravenwood might not need to sell all of its land because of the funds it had received under the Freeman-Ravenwood Agreement. Because of

Ravenwood's financial condition at the outset of its dealings with Cumberland, it did not seem likely that Ravenwood would be able to sell less than the full 91.62 acres at that time. Following the Freeman-Ravenwood Agreement, Ravenwood and Cumberland decided to continue their business relationship and executed the Ravenwood-Cumberland Agreement, dated December 11, 2003. The Ravenwood-Cumberland Agreement indicates that Cumberland had already provided valuable services and would "continue to perform such services."

The sale to Freeman closed on January 7, 2005, at which time Ravenwood received an infusion of cash. Because of its better financial condition, Ravenwood was able to contemplate the possibility of working with other developers, a prospect that was not available before the Freeman transaction closed. At this point, Ravenwood and Cumberland again met to discuss their business arrangement and, at that time, executed the Amended Ravenwood-Cumberland Agreement, which also indicates that Cumberland has, and will continue, to provide valuable services to Ravenwood.

From our review of the record, and the documents executed by Ravenwood and Cumberland, it is clear that each of these documents represents the desire for a continued relationship. The trial court acknowledged this fact when it stated that "lots of work was left to be done...when [the Ravenwood-Cumberland Agreement] was entered into, and there were continuing services that both parties expected the plaintiffs would provide." The execution of the Ravenwood-Cumberland Agreement, and the amendment thereto, was precipitated by a change in Ravenwood's financial standing and each document contemplated ongoing services from Cumberland in pursuit of other business opportunities for Ravenwood.

More importantly, the plain language of the buyout provision supports the trial court's finding that consideration existed. It is important to note that the buyout provision contained in the first Ravenwood-Cumberland Agreement was mutual:

> Should Ravenwood Club for any reason not sell all of the
> Property ... on or before March 1, 2005 ...then Ravenwood Club
> shall have the right upon written notice to Cumberland, and
> Ravenwood Club shall have the obligation upon written request
> from Cumberland, to buyout the remaining Fee.

This language clearly indicates that both Cumberland and Ravenwood made the same promise, and took the same risk–that, at any time after March 1, 2005, either party could "call," and the other risked not making as much money as it might have. It is also important to note that, when the Ravenwood-Cumberland Agreement was made, the subject property had not been rezoned; consequently, Cumberland risked being paid nothing because the value

of the land would not have increased absent a rezoning.[8] Subsequently, the mutuality language contained in the buyout clause was omitted in the Amended Ravenwood-Cumberland Agreement. The Amended Ravenwood-Cumberland Agreement provides:

> Should Ravenwood...not sell all of the Property...on or before March 1, 2005...then Ravenwood...shall have the obligation upon written request from Cumberland, to buyout the remaining Fee by paying Cumberland the remaining Fee under the schedule in Paragraph 6...based upon the fair market value of the remaining Property....

Because the reason for the omission of the mutuality language in the Amended Ravenwood-Cumberland Agreement is not contained in the appellate record, whether the omission was intentional or a typographical error is not dispositive. Even if we assume that the mutuality language was intentionally omitted, Cumberland clearly gave additional consideration for the Amended Ravenwood-Cumberland Agreement by assuming four new enumerated services in the Amended Ravenwood-Cumberland Agreement, as set out above.

From the totality of the circumstances, we conclude that sufficient consideration existed for the Letter, the Ravenwood-Cumberland Agreement, and the Amended Ravenwood-Cumberland Agreement.

### Illegality / Public Policy

Ravenwood next asserts that Paragraph 7(a) of the Ravenwood-Cumberland Agreement is unenforceable because it allegedly violates the public policy of the State of Tennessee and the laws regulating licensed real estate brokers. The question of whether a contract, or a provision thereof, is against public policy is a question of law. *See Vintage Health Resources v. Guiangan*, 308 S.W.3d 448 (Tenn. Ct. App. 2009), *perm. app denied* (Tenn. Feb. 22, 2010).

At trial, the parties stipulated that Cumberland and Mr. Dukes were licensed real

---

[8] Paragraph 7:1(c) of the Freeman-Ravenwood Agreement provides, in relevant part, as follows:

> Purchaser agrees that it shall exercise its best efforts to rezone the [subject property, i.e., approximately 30 acres of retained pasture land] for single-family residential use....

estate brokers.  However, it is important to note that, in Paragraph 6.4 of the Freeman-Ravenwood Agreement, Ravenwood specifically warrants that "no broker or agent has been engaged by it in connection with the negotiation and/or consummation of this Agreement." Nevertheless, Ravenwood now takes the position that Cumberland was acting as a broker in this case.  Specifically, Ravenwood contends that, under Tennessee law, a real estate broker can never receive payment from any transaction unless a purchase of land has been completed and the broker is paid a commission.  Cumberland argued, and the trial court agreed, that, in the context of this business arrangement, Cumberland was not engaged as a real estate broker.

In support of its argument, Ravenwood relies upon the case of ***Burton v. Rose***, 194 S.W. 575 (Tenn. 1917) for the proposition that an agent or broker who does nothing more than produce a party who enters into an option contract is not entitled to his or her commission.  As is relevant to this appeal, the ***Burton*** Court concluded that an agent does not "show a performance entitling him to recover the contract percentage by merely producing a person who enters into a contract with the owner by the terms of which it is optional...." ***Burton***, 194 S.W. at 575.  Specifically, the ***Burton*** Court reasoned that "[n]o absolute purchaser, ready, able, and willing to take the property, is procured in such case." ***Id***.  Instead, the agent "must rely upon the option ripening into a sale absolute for his commission." ***Id***.  We have reviewed the ***Burton*** case and conclude that its holding is limited to this: when a contract establishes a broker's payment based solely upon a commissioned percentage of the sale price, the broker does not get paid until the land actually sells. ***Id***. Consequently, ***Burton*** is not controlling in the instant case.

This Court finds more guidance from The Tennessee Real Estate Broker License Act, and specifically Tennessee Code Annotated Section 62-13-102(4)(A), which defines a "broker" as:

> [A]ny person who, for a fee, commission, finders fee or any other valuable consideration or with the intent or expectation of receiving a fee, commission, finders fee or any other valuable consideration from another, solicits, negotiates or attempts to solicit or negotiate the listing, sale, purchase, exchange, lease or option to buy, sell, rent or exchange for any real estate or of the improvements on the real estate or any time-share interval as defined in the Tennessee Time-Share Act, compiled in title 66, chapter 32, part 1, collects rents or attempts to collect rents, auctions or offers to auction or who advertises or holds out as engaged in any of the foregoing...

By its plain language, the statute specifically contemplates that a broker may be paid by a "fee, commission, finder's fee, or any other valuable consideration." Tenn. Code Ann. § 62-13-102(4)(A); *see also* **Pacesetter Props. Inc. v. Hardaway**, 635 S.W.2d 382, 391 (Tenn. Ct. App. 1981) (finding that real estate finder's fees are created by contract and are enforceable upon terms of same). While Ravenwood argues that its fee arrangement with Cumberland was strictly a sale-based commission, the plain language of the parties' agreement establishes a method for payment in case the property does not sell (i.e., the buyout provision, *supra*). Ravenwood cites Mr. Dukes' testimony that his payment was "contingent" in order to negate the plain terms of the agreement establishing a mechanism for payment in the absence of a sale. In relevant part, Mr. Dukes testified:

> Q. So your payment under this contract was entirely contingent; is that correct?
>
> A. Yes, sir.
>
> Q. The three percent was contingent upon negotiating a payment in case?
>
> A. Yes, sir.
>
> Q. And the other percentages were contingent upon either a sale or upon a value upon giving the notice; is that correct.
>
> A. Yes, sir.

A close reading of this section of Mr. Dukes' testimony, however, does not support Ravenwood's argument. Mr. Dukes does not testify that Cumberland's payment is completely contingent upon a sale; rather, he states that some of Cumberland's payment is contingent upon sale and some is contingent upon Cumberland finding a buyer, whether or not the sale is completed. From Mr. Dukes' testimony, and in light of the plain language of the contractual provision, we conclude that neither Cumberland, nor Mr. Dukes, violated The Tennessee Real Estate Broker License Act in the contract made with Ravenwood. The parties' fee agreement is contractual in nature. Although the contract provides for payment to Cumberland, even in the absence of a completed sale, this arrangement does not violate the plain language of the Tennessee Real Estate Broker License Act, which specifically allows a broker to accept "a finders fee, or any other valuable consideration" for its services.

**Parole Evidence**

-20-

Ravenwood asserts that the trial court erred in admitting parol evidence, which it contends altered the terms of the written agreement with Cumberland. Although, as set out above, the court stated that it was aided by the testimony of Mr. Dukes, it is important to note that it was Ravenwood, not Cumberland, that elicited the parol evidence in question during its cross-examination of Mr. Dukes. From the transcript, Ravenwood vigorously cross-examined Mr. Dukes concerning the written agreement. In fact, Ravenwood was so thorough in its cross-examination that Mr. Dukes was questioned about punctuation marks contained in the agreement. To the extent that Ravenwood elicited the testimony to which it now objects, the objection is waived. *Palanki ex rel. Palanki v. Vanderbilt Univ.*, 215 S.W.3d 380. (Tenn. Ct. App. 2006). In *Palanki*, this Court specifically stated:

> [A] party cannot generally be heard to complain about testimony elicited by his own cross-examination of an opposing party or a witness. *Bakery Servs., Inc. v. Thornton Chevrolet, Inc.*, 224 Ga.App. 31, 479 S.E.2d 363, 365 (1996), *Doucette v. Doucette*, 168 Vt. 626, 725 A.2d 901, 904 (1998), *Dorfman v. Schwabl*, 777 So.2d 427, 429-30 (Fla.Dist.Ct.App.2000). The Supreme Court has held:
>
>> It was assigned as error that the Court, over the objection of defendant's counsel, permitted the plaintiff to testify in regard to a rent contract which was a wholly independent matter, and said contract, if admissible, being in writing, it should have been produced.
>> In answer to this assignment of error it may be stated that this evidence was brought out by defendant's counsel in his cross-examination of plaintiff. Not one word was said about it in the original examination.
>
> *Cartwright v. Smith*, 104 Tenn. 688, 58 S.W. 331, 332 (Tenn. 1900).
>
> The rule is based upon the general principle that a party cannot take advantage of errors which that party has induced or invited. *Gentry v. Betty Lou Bakeries*, 171 Tenn. 20, 100 S.W.2d 230, 231 (1937).

*Palanki*, 215 S.W.3d at 392.

It appears, moreover, that the trial court did not base its judgment on Mr. Dukes' testimony; rather, the court stated that it was aided by this testimony, but then stated that it was relying upon the language of the agreement between the parties, and specifically the language "which refers to agreeing upon the fair market value of the property and membership interest upon which the Plaintiff's fee will be based, the definition of proceeds, and the definition of property." On appeal, Ravenwood contends that Mr. Dukes' testimony lacked credibility. Although the trial court did not make a specific finding that Mr. Dukes was a credible witness, we concede that, to the extent that the trial court was aided by Mr. Dukes' testimony, we can conclude that the trial court did find Mr. Dukes at least somewhat credible. It is well settled that, when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See **McCaleb v. Saturn Corp**.*, 910 S.W.2d 412, 415 (Tenn. 1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. ***Whitaker***, 957 S.W.2d at 837; *see also **Walton v. Young***, 950 S.W.2d 956, 959 (Tenn. 1997).

## Damages

From our review of the record, it is apparent that Ravenwood's theory of damages has been somewhat inconsistent. In its motion for summary judgment, Ravenwood claimed that Cumberland was entitled to no more than $120,000. However, in closing arguments at trial, counsel for Ravenwood claimed that Cumberland was entitled to "an amount no greater than $93,591.60." And, on appeal, Ravenwood asserts that the proper amount of damages owed to Cumberland is "at most...$143,591.60." In contrast, from the record, it appears that Cumberland has always relied upon the written agreement for its damages calculation. Again, the fee schedule, as set out in the Ravenwood-Cumberland Agreement is as follows:

> 1. Ten (10) percent of the amount of increase of Proceeds from One Million Dollars ($1,000,000) to One Million Two Hundred Thousand Dollars ($1,200,000).
> 2. Fifteen (15) percent of the amount of increase of Proceeds from One Million Two Hundred Thousand Dollars ($1,200,000) to One Million Four Hundred Thousand Dollars ($1,400,000).
> 3. Twenty (20) percent of any amount of increase of Proceeds in excess of One Million Four Hundred Thousand Dollars ($1,400,000).

It is clear from the record, and from the plain language of the contract, that

Cumberland's fee is based upon a tiered system. This interpretation is in keeping with the parties' stated goal that Ravenwood wished to provide Cumberland with an incentive to increase the purchase amounts for the ninety-one acres of property with potential buyers. From the entire agreement, we agree with the trial court's determination that "proceeds," as used by the parties includes not only revenue from the sale of the ninety one acre parcel of land, but also (and alternatively) revenue from any sales plus the market value of unsold land at the time Cumberland requested payment under the buyout provision.

It is undisputed that sixty acres of land sold for $867,958. The parties further agreed that the remaining thirty-one acres were worth $2,000,000 when Cumberland exercised its option to be paid. Thus, the total Proceeds are $2,867,958. Pursuant to the tiered fee structure, Cumberland's fee is calculated as follows:

| **Contractual Term** | **Calculation** | **Fee** |
|---|---|---|
| 10% of the amount between $1,000,000 and $1,200,000 | .1(200,000) | $20,000 |
| 15% of the amount between $1,200,000 and $1,400,000 | .15(200,000) | $30,000 |
| 20% of the amount exceeding $1,400,000 | .2(1,467,958) | <u>$293,591.60</u> |
| | **Total Fee** | **$343,591.60** |

As set out in its order, *supra*, this is the exact formula used by the trial court. Based upon the language of the contract, we conclude that the trial court properly interpreted the contract and properly calculated Cumberland's fee. Moreover, based upon the provisions of the Ravenwood-Cumberland Agreement, which provides for pre-judgment interest, attorney's fees, and expenses, we conclude that the trial court was correct in awarding these amounts as well. Concerning interest, although the agreement provides for its payment, it does not specify a rate for either pre, or post-judgment interest. Because the contract is specifically governed by Tennessee law,[9] Tennessee Code Annotated Section 47-14-123

---

[9] Paragraph 13 of the Ravenwood-Cumberland Agreement provides:

> This Agreement shall be a Tennessee contract. This Agreement shall be performed in, and construed under, the laws of the State of Tennessee. Any litigation in relation to this Agreement shall be conducted only in the Courts located within Davidson County, Tennessee. In any litigation in relation to this Agreement, the prevailing party shall be entitled to recover attorney's fees and all costs of litigation, including, but not limited to, discovery, depositions, travel, court costs, experts and the like.

supports the interest rate applied by the trial court.[10]

For the foregoing reasons, we affirm the order of the trial court. Costs of this appeal are assessed against the Appellants, Ravenwood Club, Inc. and Ravenwood Country Club, L.L.C., and their surety. Pursuant to the terms of the Ravenwood-Cumberland Agreement, *see* fn. 9, Cumberland requests that this Court award it attorney's fees and costs in defending this appeal. As specifically set out in Paragraph 13 of the parties' agreement, we conclude that Cumberland, as the prevailing party, is entitled to collect its reasonable attorney's fees and costs incurred in defending this appeal. Therefore, we remand to the trial court for a determination of the appropriate fee amount and for entry of judgment in favor of Cumberland for the attorney fees and expenses.

_____
J. STEVEN STAFFORD, JUDGE

---

[10] Tennessee Code Annotated Section 47-14-123 provides, in relevant part, as follows:

> Prejudgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum...