**COOKEVILLE GYNECOLOGY & OBSTETRICS, P.C.**

v.

**SOUTHEASTERN DATA SYSTEMS, INC.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

April 15, 1994.

On Petition for Rehearing May 11, 1994.

Permission to Appeal Denied by Supreme Court Aug. 29, 1994.

Albert J. Harb, James M. Cornelius, Jr., Hodges, Doughty & Carson, Knoxville, for appellant.

Rankin B. Bennett, Bennett & Goolsby, Cookeville, for appellee.

LEWIS, Judge.

## OPINION

Plaintiff Cookeville Gynecology & Obstetrics, P.C. (Cookeville, P.C.), purchased a computer system from defendant Southeastern Data Systems, Inc. (SDS). Cookeville, P.C. contends it had a "satisfaction guaranteed, money back" contract with SDS. SDS insists that the guarantee of Cookeville, P.C. was that Cookeville, P.C. would be offered a full refund if the computer system did not perform as stated in the proposals of SDS after the Implementation Plan was completed.

The Chancellor, following a bench trial, found the letter agreement of 9 October, 1990 "vague and ambiguous" and allowed oral testimony to vary and explain the 9 October 1990 letter agreement. That letter agreement is as follows:

James W. Shaw, M.D.
Cookeville Gynecology & Obstetrics, P.C.
137 West Second Street
Cookeville, TN 38501

Dear Dr. Shaw:

I am writing you this letter to confirm our understanding that if for any reason you wish to no longer avail yourself of the support offered by Southeastern Data Systems, Inc., if we should fail to provide the necessary level of support that your group requires or Southeastern Data Systems, Inc. should no longer be able to provide the level of support required, then the Source Code for the programs that you have licensed from VERSYSS and SDS shall be provided to your group. It is further understood, however, that your group would have no right to resell or market in any manner this same software. The Source Code would be provided solely for the support of James Shaw, M.D.

Southeastern Data Systems, Inc. guarantees that the VERSYSS Medical Billing System will perform as specified in our proposal. It is further understood that Southeastern Data Systems, Inc. will guarantee that your system will be implemented on a timely basis as is to be specified in our Implementation Plan. This is an installation program that will define dates for each phase of your system implementation encompassing not only hardware installation but also the training on the Medical Billing System. For this installation to be a success both your practice and Southeastern Data Systems must be committed to this end. If Southeastern Data Systems, Inc. fails to meet these objectives as outlined in our sales documents, then we will refund your system purchase price in full. Remember, the key to the success of this relationship is the schedule for implementation and an open line of communication. Once the implementation schedule has been met, the guarantee is no longer in effect.

I am looking forward to a long and lasting relationship. Please let me know if I or any of my staff can be of further services.

Sincerely,

Pat Sedlacek
President

Pat Shaw, the corporate secretary of Cookeville, P.C. and the wife of Dr. James Shaw, the owner of Cookeville, P.C., attended a meeting where she first saw a computer system manufactured by VERSYSS. The system was displayed and demonstrated by a company from Nashville. Ms. Shaw asked one of the employees if that system would do Global OB–GYN and other areas of concern regarding insurance and electronic billing. Ms. Shaw was advised that the computer would in fact do the things that she desired. Based upon her conversation and the demonstration, she left her name and asked that someone call her regarding the purchase of a VERSYSS computer system.

Shortly thereafter, Scott Rogers, an employee of defendant SDS, contacted Ms. Shaw to set up a meeting to discuss her practice needs. The meeting was held on 18 April 1990 and at that meeting a practice means analysis was completed. Mr. Rogers found out how many terminals, printers, and types of equipment Cookeville, P.C. desired, and the practice needs in terms of the type of software modules they were looking for, practice volumes and number of patients they had seen. A demonstration was arranged for Friday, 20 April 1990, at which

time Mr. Rogers demonstrated the functions of the computer, including, but not limited to, Global OB–GYN, the Mends Practice Management System, including patient billing, appointments and recall logging, medical records, and electronic claims submission. A proposal was given to Ms. Shaw on 26 April 1990 outlining the price and abilities of the software and the system. Ms. Shaw did not purchase under this proposal.

Mr. Rogers called later and met with Ms. Shaw. Another proposal dated 7 September 1990 was given to her. This proposal remained the same with respect to the Mends II Software; however, the hardware specifications were changed. Plaintiff did not buy the hardware set forth in this proposal, but did later buy the software that was represented in the 7 September 1990 proposal and the previous proposal.

Defendant was asked to break down the price for plaintiff. This was done and a letter was presented to Ms. Shaw on 18 September 1990, the next scheduled meeting at her office. This letter was presented in a meeting at Ms. Shaw's office.

At the 18 September meeting Ms. Shaw was given three options concerning the purchase of the computer system. One, she could pay thirty percent up front and the balance upon installation. Two, plaintiff could pay the entire amount up front and receive a cash discount of five percent, and third, plaintiff could lease the system. Plaintiff chose to pay the full amount up front to get the cash discount.

By choosing the cash discount and paying in full before installation was complete, Ms. Shaw felt that she would lose all leverage. She inquired about her leverage regarding performance and assurance that the system would be installed and operate as promised.

In order to confirm the discussions between herself and defendant, Ms. Shaw requested that Mr. Sedlacek write her a letter covering what they had discussed. Mr. Sedlacek complied with this request and sent her the guarantee letter of 9 October 1990.

When Ms. Shaw received the 9 October 1990 letter she did not communicate with defendant and advise defendant that the letter was inaccurate. In fact, Ms. Shaw referred to the 9 October 1990 letter as the agreement of the parties regarding the guarantee. Ms. Shaw testified by deposition and at trial that the 9 October 1990 letter accurately reflected the substance of the conversation she had with Mr. Sedlacek on 18 September 1990 regarding the Source Code and her ability to return the system.

Nothing in the 9 October 1990 letter gives plaintiff an unconditional money back guarantee. We are of the opinion that Ms. Shaw's testimony in which she interprets her handwritten notes on the bottom of a letter dated 18 September 1990, can in no way be interpreted as an unconditional money back guarantee, but rather, as a condition upon performance.

We are of the opinion that the 9 October 1990 letter is plain and is not ambiguous. Nothing in this letter makes an unconditional money back guarantee if plaintiff was not completely satisfied. The terms of the letter demonstrate that plaintiff was entitled to a refund if the computer system did not perform as specified in the proposal once it was fully implemented.

Plaintiff was not entitled to request a refund on 31 December 1990 since the proof at trial clearly demonstrated that the computer system would perform as specified in the proposal and also demonstrated that defendant was current in its obligations under the Implementation Plan as of 31 December 1990.

Until 26 November 1990 plaintiff made no complaints of dissatisfaction with the installation of the system or the training. Pat Shaw did not try to rescind the contracts. As of 19 December 1990 plaintiff still had not decided to rescind. Pat Sedlacek testified the on-site training as of 19 December 1990 was absolutely according to schedule. Ms. Shaw did note "minus time troubleshooting" on the record of 26 November 1990.

As of 19 December 1990, institution of the system was going according to the Implementation Plan and rescission had not been sought. Specific instructions were written up for deleting charges, and Ms. Shaw was going to wait until the first of the year

because they were increasing fees and changing codes.

Through 19 December 1990 Ms. Shaw never attempted to cancel the contract because of a missed meeting, and SDS was up to date with the on-site training as per the Implementation Plan. Following 19 December and before the letter was written by Ms. Shaw on 31 December 1990, no communications were had between plaintiff and defendant.

On 31 December 1990 Ms. Shaw wrote to defendant requesting a refund of the full purchase price. Because of the cancellation on 31 December 1990 before the system was fully implemented, plaintiff was never able to determine whether the computer would do cancellations, reschedules, no shows, accounts receivable billing, advanced practice modules, appointment and recall logging, Global GYN, letter writing modular electric billing, all of which was specified in the SDS proposal. The evidence at trial demonstrated that the system would in fact perform all the functions as specified in the SDS proposal.

The evidence in the record before us demonstrates that plaintiff was not entitled to cancel the contract and request a refund on 31 December 1990. The system was performing as specified in the proposal, and SDS was meeting its obligations under the Implementation Plan.

After receiving Ms. Shaw's letter of 31 December on 9 January 1991, the president of SDS immediately wrote to Ms. Shaw, addressing each of the problems Ms. Shaw had delineated. Mr. Sedlacek offered to purchase another label printer at no cost to plaintiff and take whatever steps were necessary to complete the original installation for the date stated in the Implementation Plan, allowing an additional two weeks which had been lost while the system was shut down. Mr. Sedlacek went to Cookeville on at least two occasions following his letter in an attempt to meet with Ms. Shaw. On 23 January Mr. Sedlacek again wrote plaintiff asking that SDS be allowed to come in so that a move towards completion of the installation of the system and system implementation could be achieved. At that time he attached new OB procedures which were identical to the basic steps which Vickie Shields, an employee of SDS, had written up on 17 December 1990, Ms. Shaw refused to allow SDS to try and cure any problems with performance of the system. In a letter of 5 February 1991 Ms. Shaw stated that "we have said 'no' numerous times and numerous ways."

SDS made repeated efforts to attempt to cure any deficiency including a complete update of the system and purchase of another printer to substitute for that of the Seiko. They were all rejected by plaintiff.

In *Samples v. Guerdon Industries, Inc.*, No. 4, 1986 WL 10922 (Tenn.App.1986), this court stated:

> However, in this case, the plaintiff has frustrated the course of conduct contemplated by the Uniform Commercial Code for reasonable buyers, in that he has refused to allow the defendant to cure the nonconformity complained of. Not only did the plaintiff deny the defendants an opportunity to cure the nonconformity, but he even foreclosed any discussion of replacing the complained of mobile home with a new one. The plaintiff had nothing to lose by allowing the defendant to cure the nonconformity. Had the plaintiff allowed the defendant to attempt to cure the nonconformity and those efforts failed, then he could still have revoked his acceptance. The plaintiff, however, would not allow cure of a nonconformity.

*Id.* at *3.

Cookeville, P.C., like plaintiff in *Guerdon*, has foreclosed any opportunity by the defendant to cure any nonconformities. Had Cookeville, P.C. allowed SDS to cure the nonconformity and those efforts failed, then Cookeville, P.C. could still have revoked their acceptance.

■ We are of the opinion that the Chancellor erred in finding that the letter agreement of 9 October 1990 was "vague and ambiguous" and therefore in allowing oral testimony to vary and explain the letter agreement.

■ The rights of the parties must be determined by what they have put into their agreement. *Mills–Morris Co. v. Champion*

*Spark Plug Co.*, 7 F.2d 38, 39 (6th Cir.1925). It is the duty of the courts to enforce contracts according to their plain terms. *Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975).

> The standard of interpretation of an agreement except where it produces an ambiguous result, or is excluded by a rule of law establishing a definite meaning, is the meaning that would be attached to the [agreement] by a reasonably intelligent person acquainted with all the operative usages and knowing all the circumstances prior to and contemporaneous with the making of the [agreement], other than oral statements by the parties of what they intended it to mean.

*Earle v. Illinois Cent. R.R. Co.*, 25 Tenn.App. 660, 167 S.W.2d 15, *cert. denied*, 317 U.S. 680, 63 S.Ct. 161, 87 L.Ed. 546 (1942).

■ An ambiguity does not arise in a contract merely because the parties may differ as to interpretations of certain of its provisions. *Oman Constr. Co. v. Tennessee Valley Authority*, 486 F.Supp. 375, 382 (M.D.Tenn.1979).

"A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one. A strained construction may not be placed on the language used to find ambiguity where none exists." *Farmers–Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn.1975).

■ Neither the parties nor the courts can create an ambiguity where none exists in a contract. *Edwards v. Travelers Indem. Co.*, 201 Tenn. 435, 300 S.W.2d 615, 617–18 (Tenn. 1957).

■ In any search for meaning of an instrument its terms are to be interpreted and their legal effect determined by consideration of the agreement as a whole. *Hill & Range Songs, Inc. v. Fred Rose Music, Inc.*, 570 F.2d 554, 556 (6th Cir.1978). "Contracts must be read in their entirety." *Paul v. Insurance Co. of North America*, 675 S.W.2d 481, 483 (Tenn.App.1984).

■ The record shows that the plaintiff's revocation of acceptance was premature.

Defendant asserted its right to adjustment and cure prior to the expiration of the time for contract completion. This was denied by Cookeville, P.C. Defendant sought to extend the time for which plaintiff could make a decision once the right to cure had been completed. This was rejected by Cookeville, P.C. Cookeville, P.C. refused to allow SDS to cure and perform under the contract which was agreed to by the original sales agreement and under the letter of guarantee of 9 October 1990. Tennessee Code Annotated § 47–2–609 provides: "A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired." Tenn.Code Ann. § 47–2–609 (1992). Cookeville, P.C. breached its duty of allowing SDS to attempt to complete its contract and cure any nonconformity.

The trial court was in error in determining that defendant was not entitled to cure any deficiency in its performance before plaintiff was entitled to request a refund.

The language of the 9 October 1990 guarantee letter is clear. Plaintiff is entitled to a full refund only if the computer did not perform as specified in the proposals once it is fully implemented in accordance with the Implementation Plan. The evidence shows that defendant was performing according to schedule under the Implementation Plan, and plaintiff was never able to determine whether the system would perform as specified in the proposal, because plaintiff terminated the agreement before the system was fully operational. The time for defendant's performance had not expired, and defendant had a right to cure any deficiencies in its performance up to and including 28 February 1991.

The judgment of the trial court that the plaintiff is entitled to a full refund is reversed, and the cause is remanded to the trial court for entry of an order dismissing plaintiff's suit and allowing SDS a reasonable time within which to cure any deficiencies.

Costs on appeal are taxed to plaintiff, Cookeville Gynecology & Obstetrics, P.C.

CANTRELL and KOCH, JJ., concur.

*ORDER ON PETITION
FOR REHEARING*

May 11, 1994

Defendant/appellant, Southeastern Data Systems, Inc. has filed its Petition to Rehear this court's opinion and judgment entered on 15 April 1994 on the ground that the court did not address the "defendant's counter-complaint of the attorney's fees sought thereunder."

While Southeastern Data Systems did not present any issue regarding attorney's fees, they did in the conclusion of their brief "request that the trial court be reversed and since revocation was the remedy sought, the matter be dismissed and that SDS be awarded its attorney's fees as sought in its counter-complaint and as provided for in the contract."

While attorney's fees may be recovered by a prevailing party when attorney's fees are provided for by statute or by contract between the parties, *Goings v. Aetna Casualty & Surety Co.*, 491 S.W.2d 847 (Tenn.App.1972), defendant did not present the issue of its entitlement to attorney's fees in its issues or at oral argument. Tenn. R.App.P. 13(b) provides in part that "review generally will extend only to those issues presented for review." Since the issue of attorney's fees, while referred to in the brief, was not presented as an issue, we decline to consider that issue.

It results that the Petition for Rehearing is denied at the cost of defendant/appellant Southeastern Data Systems, Inc.

/s/ Samuel L. Lewis
SAMUEL L. LEWIS,
Judge

/s/ Ben H. Cantrell
BEN H. CANTRELL,
Judge

KOCH, J., dissents.

KOCH, Judge, dissenting.

Cookeville Gynecology & Obstetrics, P.C. ("Cookeville Gynecology") sued Southeastern Data Systems, Inc. ("Southeastern Data") for fraudulent and negligent misrepresentations and for breach of contract and breach of warranty. The Chancery Court for Putnam County awarded Cookeville Gynecology $31,139.37 and dismissed Southeastern Data's counterclaim for attorney's fees because it had already determined that Cookeville Gynecology had not breached the contract. Southeastern Data appealed requesting reversal of the judgment and recovery of its attorney's fees.

We reversed the judgment in favor of Cookeville Gynecology in our April 15, 1994 opinion but made no mention of Southeastern Data's request for its attorney's fees. Southeastern Data called this oversight to our attention in a timely petition for rehearing. The other members of this panel have chosen to deny the petition for rehearing on the technical grounds that Southeastern Data did not include a specific issue dealing with attorney's fees in its brief even though it requested this relief in the conclusion to its brief.

I do not share the majority's reluctance to consider the attorney's fees matter. We have concluded that the trial court erred when it determined that Southeastern Data had breached its warranties concerning the computer system it sold to Cookeville Gynecology. I would remand the case to the trial court for further proceedings concerning Southeastern Data's counterclaim for attorney's fees since we have now determined that Cookeville Gynecology defaulted by canceling the contract prematurely.