FILED
05/22/2020
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 15, 2020

## STRATEGIC ACQUISITIONS GROUP, LLC v. PREMIER PARKING OF TENNESSEE, LLC

**Appeal from the Circuit Court for Sevier County**
**No. 18-CV-665I     Carter Scott Moore, Judge**

_____

**No. E2019-01631-COA-R3-CV**

_____

Plaintiff lessor appeals the trial court's decision to grant summary judgment concerning the interpretation of a lease in favor of the defendant lessee.  Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which RICHARD H. DINKINS, and THOMAS R. FRIERSON, II, JJ., joined.

Robert Cuyler Haskins and Wesley Edward Shipe, Knoxville, Tennessee, for the appellant, Strategic Acquisitions Group, LLC.

Celeste Huffman Herbert, Knoxville, Tennessee, for the appellee, Premier Parking of Tennessee, LLC.

## OPINION

### BACKGROUND

This case was resolved on a motion for summary judgment. The following facts are undisputed for purposes of appeal. On May 31, 2014, Defendant/Appellee Premier Parking of Tennessee, LLC ("Premier") entered into a lease to operate a paid parking lot along Reagan Drive in Gatlinburg, Tennessee with Next Holiday Parking A, LLC, and Next Holiday Parking B, LLC. On approximately November 20, 2015, the lessors Next Holiday Parking A, LLC, and Next Holiday Parking B, LLC, transferred their ownership of the parking lot and their interest in the lease to Plaintiff/Appellant Strategic

Acquisitions Group, LLC ("SAG").

The lease of the paid parking lot between SAG and Premier had an original term until April 30, 2021. Section 9.1 of the agreement provided for restoration of the paid parking lot after the property was damaged by "Fire or Other Casualty" by stating the following:

> In the event the [Parking Lot is] partially or totally damaged or destroyed by fire or other casualty, Tenant immediately shall give Landlord notice of such damage or destruction. Landlord shall proceed diligently to restore the [Parking Lot] to the condition [it was] in immediately prior to such damage or destruction. Notwithstanding the foregoing, in the event such damage or destruction occurs in the last Lease Year of the term of this Lease, Landlord shall have the right to terminate this lease by notice to Tenant.

Further, if Premier was unable to use part or all of the parking lot due to property damage, its rent obligation would be abated on a pro rata basis.

Under section 18.2(a) of the agreement, Premier could terminate the lease upon notice to SAG within thirty days of any occurrence of the following events:

1. If any license, franchise, right or privilege to operate an automobile parking facility in the Parking Facility by Tenant is revoked or suspended for thirty (30) consecutive days by any governing authority having jurisdiction over the Premises.

2. The permanent closing to vehicular traffic on Reagan Drive or Historic Nature Trail by any governing authority having jurisdiction thereof.

3. The denial of access by any governing authority having jurisdiction over the Premises to Reagan Drive or Historic Nature Trail from the Premises if the Adjusted Gross Revenues at the Parking Facility during the three (3) calendar months immediately following such denial of access are more than twenty five (25%) percent less than the same three calendar months in the prior Lease Year.

4. The alteration or change by appropriate legal action by any governing authority having jurisdiction over the Premises of the vehicular traffic pattern or flow in Reagan Drive or Historic Nature Trail if the Adjusted Gross Revenues at the Parking Facility during the three (3) calendar months immediately following such alteration or change are more than twenty five (25%) percent less than the same three (3) calendar months in the prior Lease Year.

The City of Gatlinburg was struck by a disastrous wildfire that swept through

Sevier County and the Great Smoky Mountains National Park in November and December of 2016. The wildfire caused immense damage and led Gatlinburg officials to order a mandatory evacuation of the city on November 28, 2016. The evacuation order was lifted eleven days later on December 9, 2016. The paid parking lot suffered damage to its fencing, signage, and other improvements by the fire's high winds. Premier notified SAG of the property damage on approximately December 15, 2016. Premier lost 42% of its adjusted gross revenues on the property in the three months following the wildfire.

On March 3, 2017, Premier sought to terminate its lease of the paid parking lot with SAG. Premier cited Section 18.2(a)(3) of the lease, which provided for termination after the "denial of access by any governing authority having jurisdiction over the [parking lot] to Reagan Drive or Historic Nature Trail from the [parking lot]" and the loss of adjusted gross revenues of more than 25% over three months compared to the year before, as grounds for unilateral termination. On approximately March 16, 2017, SAG disputed Premier's assertion that it could terminate the lease following the wildfire and a subsequent loss of revenue.

Premier stopped paying rent after March 2017 and vacated the premises in early April 2017. SAG entered an agreement with a new parking lot operator in June 2017. SAG claims that it generates less revenue through its new lease than it did under its previous lease with Premier.

SAG filed a lawsuit against Premier in Sevier County Circuit Court ("the trial court") on October 10, 2018. In the complaint, SAG alleged Premier breached its lease by vacating the paid parking lot and failing to pay rent after March 2017. Premier denied any breach of the contract and argued that the termination of the lease occurred as outlined in the lease itself. Premier also argued that SAG failed to state a claim for which relief could be granted, failed to mitigate its damages, and was guilty of laches, which would prevent it from obtaining relief. SAG filed a motion for partial judgment on the pleadings for all issues excluding damages on June 25, 2019. In that motion, SAG stated that there were no facts in dispute and the contract could not be interpreted to allow termination under these circumstances.

Premier filed its own Motion for Summary Judgment on June 25, 2019, stating that no facts were in dispute and that Premier had the right to terminate the lease as a matter of law. In its motion for summary judgment, Premier argued that the lease could also be terminated by "[t]he alteration or change by appropriate legal action by any governing authority having jurisdiction over the Premises of the vehicular traffic pattern or flow in Reagan Drive or Historic Nature Trail" and subsequent loss in revenue as outlined in Section 18.2(a)(4) of the lease. Both parties contested each other's motions for judgment in separate filings.

After a hearing on July 30, 2019, the trial court found no material facts were in

- 3 -

dispute, granted Premier's motion for summary judgment, and dismissed SAG's motion for partial judgment on the pleadings as moot. The trial court's oral ruling included the following:

> But nevertheless, the Court is of the opinion that 9.1 is not – I mean that is has meaning but that also 18.2 has independent meaning that can happen independently of a fire. And in least some pleadings, [Defendant's counsel] stated this is not about the destruction of the parking lot. As far as the plain language goes, Section 18.2(a), Part 3, says "the denial of access," in Part 3. And in Part 4, it says "the alteration or change by appropriate legal action by any governing authority to the vehicular pattern or flow." Either one of those based on the plain language, because we don't have any exceptions or limitations to that language, those conditions were met here. There was a denial of access. There was a change in the vehicular pattern or flow.

> And that being said, if that's found, I don't think either of the parties disagreed with the fact that their revenues were down in the amount they were, thereby triggering their ability to get out of the lease.

> So your motion for summary judgment is granted.

The trial court entered a written order granting the motion for summary judgment and dismissing the case on August 30, 2019. SAG timely filed a notice of appeal.

### ISSUE PRESENTED

SAG raises the following issue for review: Did the trial court err by interpreting the text of a lease provision in isolation from the remainder of the lease without considering intent, rather than using the unambiguous text and context to determine the parties' intent?

### STANDARD OF REVIEW

This case was decided on a motion for summary judgment. Summary judgment is appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion; and (2) the moving party is entitled to judgment as a matter of law on the undisputed facts. Tenn. R. Civ. P. 56.04. Defendant, as the party that does not bear the burden of proof at trial, may therefore obtain summary judgment if it: (1) affirmatively negates an essential element of the nonmoving party's claim; or (2) demonstrates that the nonmoving party's evidence at the summary judgment stage is insufficient to establish an essential element of the nonmoving party's claim. ***Rye v. Women's Care Ctr. of Memphis, MPLLC***, 477 S.W.3d 235, 264 (Tenn. 2015), *cert. denied*, 136 S. Ct. 2452, 195 L. Ed. 2d 265 (2016).

On appeal, this Court reviews a trial court's grant of summary judgment de novo with no presumption of correctness. *Rye*, 477 S.W.3d at 250 (citing *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997)). In reviewing the trial court's decision, we must view all of the evidence in the light most favorable to the nonmoving party and resolve all factual inferences in the nonmoving party's favor. *Luther v. Compton*, 5 S.W.3d 635, 639 (Tenn. 1999); *Muhlheim v. Knox Cnty. Bd. of Educ.*, 2 S.W.3d 927, 929 (Tenn. 1999). If the undisputed facts support only one conclusion, then the court's summary judgment will be upheld because the moving party was entitled to judgment as a matter of law. *See White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn. 1998); *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995). When a moving party has filed a properly supported motion for summary judgment, the nonmoving party must respond by pointing to specific evidence that shows summary judgment is inappropriate. *Rye*, 477 S.W.3d at 264–65.

## DISCUSSION

On appeal, SAG and Premier both submit that this matter should be resolved solely through the proper interpretation of their parking lot lease. When interpreting contracts, this Court's central aim is "to ascertain and give effect to the intent of the contracting parties." *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 566 S.W.3d 671, 694 (Tenn. 2019) (citations omitted). While we remain mindful of the context and circumstances that existed when the contracting parties entered their agreement, we also "resolve to keep the written words as the lodestar of contract interpretation." *Id.* (citations omitted). "Tennessee courts 'give primacy to the contract terms, because the words are the most reliable indicator—and the best evidence—of the parties' agreement when relations were harmonious, and where the parties were not jockeying for advantage in a contract dispute.'" *Id.* (quoting Steven W. Feldman, 21 Tenn. Practice: *Contract Law and Practice* § 8:14 (June 2018)).

When terms of a contract are not ambiguous, issues of contract interpretation are regularly considered issues of law, which in turn make them well-suited for summary judgment. *Bourland, Heflin, Alvarez, Minor & Matthews, PLC v. Heaton*, 393 S.W.3d 671, 674 (Tenn. Ct. App. 2012) (citing *Ross Prods. Div. Abbott Labs. v. State*, No. M2006-01113-COA-R3-CV, 2007 WL 4322016, at *2 (Tenn. Ct. App. Dec. 5, 2007)). As this Court has previously held:

> It is well settled that the language used in a contract must be taken and understood in its plain, ordinary, and popular sense. *Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.*, 521 S.W.2d 578 (Tenn. 1975). In construing contracts, the words expressing the parties' intentions should be given the usual, natural, and ordinary meaning. *Ballard v. North American Life & Casualty Co.*, 667 S.W.2d 79 (Tenn. Ct. App.1983). Provisions in a contract "should be construed in harmony with each other,

if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract." ***Guiliano v. Cleo, Inc.***, 995 S.W.2d 88, 95 (Tenn. 1999). If the language of a written instrument is unambiguous, the Court must interpret it as written rather than according to the unexpressed intention of one of the parties. ***Sutton v. First Nat'l Bank***, 620 S.W.2d 526 (Tenn. Ct. App. 1981). A contract is not ambiguous merely because the parties have different interpretations of the contract's various provisions, ***Cookeville Gynecology & Obstetrics, P.C. v. Southeastern Data Sys., Inc.***, 884 S.W.2d 458, 462 (Tenn. Ct. App. 1994) (citing ***Oman Constr. Co. v. Tennessee Valley Authority***, 486 F.Supp. 375, 382 (M.D. Tenn. 1979)), nor can this Court create an ambiguity where none exists in the contract. ***Cookeville P.C.***, 884 S.W.2d at 462 (citing ***Edwards v. Travelers Indem. Co.***, 201 Tenn. 435, 300 S.W.2d 615, 617–18 (1957)).

***Fisher v. Revell***, 343 S.W.3d 776, 779 (Tenn. Ct. App. 2009).

SAG argues that the trial court erred in interpreting the lease agreement to find Premier did not breach the agreement through improper termination. However, the language in the lease provided a valid means for Premier to terminate the contract, despite SAG's varied arguments to the contrary.

As terms of the contract remain central to interpreting the intent of the parties when they signed an agreement, *see **Individual Healthcare Specialists***, 566 S.W.3d at 694, we will first examine the words of the lease at issue in this case. SAG argues that the sections of the lease concerning damages from "fire and other casualty" and concerning unilateral termination by Premier, the lessee in the agreement, apply collectively and would prevent Premier from terminating in these circumstances. We begin with the clauses that would allow Premier to terminate the lease.

As stated *supra*, Premier argues that two grounds of termination existed for it to properly terminate its parking lot lease. First, Premier argues that "[t]he denial of access by any governing authority having jurisdiction over the Premises to Reagan Drive or Historic Nature Trail from the [parking lot]," combined with a lost revenue of more than 25% in the three months following the denial of access, occurred in the present case. Second, Premier claims that "[t]he alteration or change by appropriate legal action by governing authority having jurisdiction over the [parking lot] of the vehicular traffic pattern or flow in Reagan Drive or Historic Nature Trail" with a subsequent 25% loss in revenue also triggered the termination clause.[1] As either ground can be dispositive of this

---

[1] According to the pleadings, Premier only cited the "denial of access" ground when giving notice of terminating its lease. Although SAG denied that termination was valid under the "vehicular traffic pattern and flow" ground, SAG did not assert in the trial court that Premier could not rely on this ground because it was not stated as a reason for termination in Premier's initial termination letter. Issues may be both tried by consent and/or waived on appeal. According to Rule 15.02 of the Tennessee Rules of Civil

appeal, we first examine the text of section 18.2(a)(4), which concerned an alteration or change of vehicular traffic pattern or flow.

The parties obviously dispute whether the undisputed facts of this case show that a condition for termination was present. In particular, SAG submits that the interpretation of this section by both Premier and the trial court does not properly take into account the language used by the contract. We therefore consider the meaning of the operative words in this section of the contract. Because the contract provides no definitions of the relevant terms, we turn to dictionary definitions to inform our interpretation. *See Citizens Choice Home Care Servs., Inc. v. United Am. Health Care Corp.*, No. W2010-00445-COA-R3-CV, 2010 WL 4939994, at *3 (Tenn. Ct. App. Dec. 6, 2010) (stating that when a contract does not define contract terms, a dictionary can provide the "ordinary meaning" of contract terms). "Pattern" can be described as "a predictable or prescribed route, movement, etc." *Webster's New World College Dictionary* 557 (5th ed. 2014). "Flow" is defined as "the act or manner of flowing" or "to move in a way suggestive of a liquid, stream." *Id.* at 1071. *Black's Law Dictionary* defines "traffic" as "the passing to and fro of people, animals, vehicles, and vessels along a transportation route." *Black's Law Dictionary* 1634 (9th ed. 2009). Finally, the term "alteration" refers to "being altered" or "the result of an alteration." *Webster's Dictionary*, at 42. In turn, to "alter" is defined variously as "to make different in details but not in substance[,]" to "modify[,]" and "to become different; change; vary[.]" *Id.*; *see also Webster's Dictionary*, at 249 (defining "change" as, inter alia, to cause to become different; alter; transform; convert"). In our view, a straightforward reading of the terms in question comport with their dictionary definitions. Thus, using these definitions, termination was available under the lease when a governing body causes the movement or flowing of people and/or traffic on Reagan Drive or Historic Nature Trail to become different. This situation, plus a 25% drop in revenue in the following three months, results in the availability of termination by the lessee under the contract.

The undisputed facts here show that this indeed occurred. Certainly, the Gatlinburg Fire Department required all people to evacuate the city and barred entry to the city between November 28, 2016 and December 9, 2016. As part of that evacuation, people and vehicles were prevented from moving along any roads or routes around the city, including on Reagan Drive or Historic Nature Trail. Thus, a governing authority took legal action to not only alter, but completely eliminate the pattern and flow of traffic on the roads in question for a period of time. A complete stop to traffic on these roads by the governing authority therefore caused the vehicle and traffic flow to become different.

Procedure, "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Tenn. R. Civ. Pro. 15.02. Moreover, arguments not raised in the trial court cannot be raised for the first time on appeal. *See Barnes v. Barnes,* 193 S.W.3d 495, 501 (Tenn. 2006). Because SAG did not object to the consideration of this ground on the basis that it was not included in the termination letter, the trial court was permitted to consider this ground as a basis for termination of the lease.

And neither party disputes that Premier lost more than 25% of its month-to-month revenue from the parking lot in three months following the wildfire and evacuation.

SAG contends, however, that this broad interpretation is incorrect because it fails to take into account industry norms and expectations. For example, SAG contends in its brief that the alteration language refers to only permanent changes to the access points of the parking lot from the road, not to temporary emergency closures. Respectfully, we cannot agree. As previously discussed, nothing in the contract limits the terms used or indicates that the terms should not be given their ordinary and natural meanings, in accordance with well-settled Tennessee law. *Fisher*, 343 S.W.3d at 779. Further, nothing in this termination provision provides that the change in traffic flow must be permanent to trigger termination thereunder. Certainly, the contracting parties were free to place limits on the right of the lessee to terminate the contract, stating that the change in vehicle pattern or flow needed to be a permanent change. The parties' however, chose not to include this language in their contract, instead relying on the limiting device of the significant and sustained drop in revenue following the alteration. We cannot interpret a contract by including additional limitations on the parties' rights that the parties did not contract. *See Ament v. Wynne*, No. M2004-01876-COA-R3-CV, 2007 WL 2376333, at *5 (Tenn. Ct. App. Aug. 20, 2007) (cautioning that courts are not permitted to "make new contracts for the parties under the guise of unwarranted interpretation").

Finally, SAG presented no evidence that established a course of dealing or an industry standard of these terms or to show that a more limited interpretation was appropriate. Here, traffic was more than merely altered, it was completely stopped on both Reagan Drive and Historic Nature Trail. Premier lost more than 25% of its revenue year-over-year for three consecutive months thereafter. Based on the plain language of the lease, Premier would possess the ability to terminate the agreement under these circumstances.

SAG, however, advances several arguments to avoid application of the plain language of this particular provision of the contract, contending that such a result was not the intent of the parties when the lease was entered.[2] *See Individual Healthcare Specialists, Inc.*, 566 S.W.3d at 688 (directing courts to interpret contracts "so as to ascertain and give effect to the intent of the contracting parties consistent with legal principles"). In essence, SAG makes three arguments in this vein: (1) that a more specific provision of the contract controls this situation, which provision does not provide for termination under these circumstances; (2) the termination provision requires causation between the alteration of vehicle flow and the reduction in revenue, which has not been shown; and (3) the trial court's interpretation is overly broad and leads to an absurd result. We begin with SAG's argument that a separate provision of the contract controls

---

[2] We note that SAG is a successor-in-interest to the lease and not a party to the agreement when it was first executed.

in this situation.

As previously discussed, in addition to the termination provisions cited by Premier, the contract provided for rent abatement and repair if the parking lot is "partially or totally damaged or destroyed by fire or other casualty[.]" This particular provision does not provide that the lessee may terminate the lease on this basis, but rather only that the lessor has a limited right of termination in the final year of the contract.[3] SAG contends that this provision must be read in harmony with the other provisions of the contract and that, as the more specific provision, it controls over the more general termination provisions. Thus, SAG contends that the only available remedy under the contract was the abatement of rent, which SAG provided.

SAG is correct in its reference to various well-settled principles of contract interpretation. Thus, it is true that "[a]ll provisions in the contract should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999) (citing *Rainey v. Stansell*, 836 S.W.2d 117, 118–19 (Tenn. Ct. App. 1992)); *see also Cocke Co. Bd. of Highway Commr's, v. Newport Utilities Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985) (citing *Associated Press v. WGNS, Inc.*, 348 S.W.2d 507 (Tenn. 1961)) ("It is the universal rule that a contract must be viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illuminate another."). Moreover, "[w]hen a contract contains both general and specific provisions relating to the same thing, the specific provisions control. Where uncertainty exists between general and specific provisions, the specific provisions will usually qualify the general." *Mark VII Transp. Co. v. Responsive Trucking, Inc.*, 339 S.W.3d 643, 648 (Tenn. Ct. App. 2009) (citing *Cocke County Bd. of Highway Commr's*, 690 S.W.2d at 237); *see also Lamar Advertising Co. v. By-Pass Partners*, 313 S.W.3d 779, 794 (Tenn. Ct. App. 2009) (citing *Precision Mech. Contractors v. Metro. Dev. & Hous. Agency*, No. M2000-02117-COA-R3-CV, 2001 WL 1285900, at *5 (Tenn. Ct. App. Oct. 25, 2001)) (holding that the notion that specific language applies over general contract provisions is "well-settled"). We cannot agree, however, that these principles support its arguments on appeal.

As an initial matter, SAG points to no part of the contract at issue that states that any of its remedies are mutually exclusive. *Cf. Baptist Memorial Hosp. v. Argo Construction Grp.*, 308 S.W.3d 337, 344 (Tenn. Ct. App. 2009) (involving a specific exclusive remedies provision). We also cannot conclude that the rent abatement provision is more specific than the termination provision. Here, the contract provides for rent abatement in the event of partial or total property damage. Nothing in this provision requires any reduction in revenue for the lessee to avail itself of this remedy. The termination provision is not a more general provision on the same subject—it involves a

---

[3] The fire did not occur in the final year of the contract.

- 9 -

different set of facts: that the traffic flow is altered *and* that there is a reduction in revenue for the following three months.

Premier's notice of termination was not rooted in damages caused to the facility, but in the lasting effects of a natural disaster that led to a temporary rerouting of roads in the city. While the parking lot suffered wind-related damage because of the wildfire, that damage was not the reason that Premier cited when terminating the lease. Instead, Premier claimed the mandatory evacuation of Gatlinburg constituted a denial of access and change of traffic flow which, combined with a subsequent loss of income, allowed it to terminate the lease. We agree with SAG that damage alone does not create a ground for termination. Mere damage, however, was not alleged as the basis for termination in this case; rather, the basis for termination was the alteration of the traffic flow, coupled with a subsequent drop in revenue for a relatively significant period of time. We see no inconsistency or repugnancy between terms of this lease that describe how to handle damage caused in a disaster and those that explain how to terminate an agreement in particular scenarios. *See **Guiliano***, 995 S.W.2d at 95.

The timing elements of the termination clause also reflect the distinction between the two sections. Premier did not seek to terminate its lease immediately after the fire or any immediate damage was found. Instead, Premier only sought to terminate the lease after three months of decreased revenue. Further, SAG did not dispute that Premier gave notice of its termination in a timely manner, as the triggering event that led to the notice was the loss of revenue rather than the damage itself. We are therefore not persuaded that Premier was only entitled to rely on the rent abatement provision of the contract to the exclusion of the termination provisions under the particular facts of this case.

SAG next contends that the trial court's interpretation of the termination section ignores a necessary causation element between the alteration of traffic flow and the subsequent reduction in revenue. Again, we are not persuaded. First, the language of the contract belies this argument. Specifically, the termination provision at issue merely states that a ground for termination exists due to the alteration of the vehicle pattern flow on the surrounding roads "if the Adjusted Gross Revenues at the Parking Facility during the three (3) calendar months immediately following such alteration or change are more than twenty five (25%) percent less than the same three (3) calendar months in the prior Lease Year." Nothing in this language specifically states that the reduction in revenue must be shown to have been the result of the change in vehicle pattern flow.

SAG contends however, that its interpretation is proper when considering the contract as whole. As an initial matter, we must conclude that SAG's argument to this effect is, respectfully, deficient. Under Rule 27 of the Tennessee Rules of Appellate Procedure, arguments in briefs must be supported by citation to relevant authorities and references to the record. Tenn. R. App. P. 27(a)(7). The only authority cited for this argument provides that contract provisions cannot be cited in isolation. *See **Cocke Cty.***

***Bd. of Highway Commr's***, 690 S.W.2d at 297. While a correct statement of law, this portion of SAG's brief fails to point to what additional parts of the contract should lead this court to graft a causation requirement onto the plain language of the relevant termination provision. Respectfully, arguments that are skeletal in nature are generally waived by this Court. *See* ***Sneed v. Bd. of. Prof. Responsibility of Supreme Court***, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived.").

Even considering this argument, however, we find no support in the record. As an initial matter, our review of the language of the contract reveals no provisions, either in the termination section or elsewhere, that indicate the parties' intent to require causation between the change in vehicle flow and the loss of revenue sufficient to trigger a ground for termination. We also question as to whether SAG properly raised this argument during the trial court proceedings. During the summary judgment process, Premier submitted a statement of undisputed facts in which it alleged that termination occurred "because its Adjusted Gross Revenues for December 2016, January 2017 and February 2017 were 42% lower than its revenues for the same period in the previous year *due to* the fire and closure of the City of Gatlinburg." (Emphasis added). Clearly, this statement alleges a causal connection between the closure of the city and the revenue reduction. SAG, however, did not deny that the revenue losses were due to the closure of the city.[4] And it certainly did not submit any evidence to dispute this fact asserted by Premier. Material facts set forth with a motion for summary judgment "may be deemed admitted in the absence of a statement controverting them by the opposing party." ***Holland v. City of Memphis***, 125 S.W.3d 425, 428 (Tenn. Ct. 2003) (citation omitted). As SAG failed to support its argument that causation was required and failed to present evidence to dispute that causation had occurred, we see no basis to reverse the trial court's grant of summary judgment on this ground.

Lastly, SAG's additional claims posit various hypotheticals that the trial court's interpretation of the contract is far too broad. In particular, SAG posits that the lease, as interpreted, could be terminated when the streets surrounding the parking lots were closed for regular events like parades or fireworks or during disasters like fires and earthquakes. Incredulously, SAG states that "for Section 9.1 to have any effect due to a fire under this reasoning, members of the public would have to be allowed egress from

---

[4] SAG responded to the Statement of Material Evidence with the following:

> For purposes of ruling on the motion for summary judgment, [SAG] admits that the [Premier] sent a letter dated March 3, 2017 to the Plaintiff, which letter speaks for itself. [SAG] denied that the [Premier] had a right to terminate the Lease, denies that the March 3, 2017 letter had any legal effect, and denies all other factual assertions of [the statement].

the parking lot *while it was engulfed in flames*" to prevent termination of the lease. Courts in Tennessee are generally not empowered to rule on hypothetical issues. ***Island Properties Assocs. v. Reaves Firm, Inc.***, 413 S.W.3d 392, 402 (Tenn. Ct. App. 2013) ("It is not the purview of this Court to engage in the rendering of advisory opinions on hypothetical facts."). We take no position on SAG's assertions that that language of the contract offers a broad right of termination that overburdens the lessor. We note, however, that the right of termination is not unlimited—any alteration of vehicle patterns or flow must be accompanied by a subsequent reduction in revenue that is both significant and sustained to serve as a ground for termination under this provision of the contract. Regardless, it is well-settled that we cannot excuse a party from a bad contract. ***White v. Motley***, 63 Tenn. 544, 549 (Tenn. 1874) ("Courts . . . are not constituted to relieve parties of a bad bargain, or to alter or modify their contracts, to conform to changed conditions and circumstances."). In this particular case, the requirements for termination are met under the contract under the present facts. That dispute is the only one we are empowered to decide.

After examining the lease in its entirety and analyzing the arguments of the parties, we conclude that the trial court correctly granted summary judgment in the present case. The undisputed facts indicate that the conditions specified for termination of the lease by Premier occurred in this case. Traffic patterns were altered on the streets by the parking lot by a governmental authority, and more than 25% of year-over-year revenue was lost in the three months following the wildfire and evacuation. Therefore, we conclude that the termination was valid and summary judgment was proper. We pretermit all other remaining issues concerning termination of the lease.

## CONCLUSION

The judgment of the Sevier County Circuit Court is affirmed, and this cause is remanded to the trial court for further proceedings as necessary and consistent with this Opinion. Costs of this appeal are assessed to Appellant, Strategic Acquisitions Group, LLC, for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

- 12 -